NOT RECOMMENDED FOR FULL-TEXT PUBLICATON
File Name: 16a0013n.06

No. 15-3128

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 08, 2016
DEBORAH S. HUNT, Clerk

BIBATA BOUREIMA MAMANE,                      )
                                             )
           Petitioner,                       )
                                             )
           v.                                )          ON PETITION FOR REVIEW
                                             )           FROM THE BOARD OF
                                             )           IMMIGRATION APPEALS
LORETTA E. LYNCH, Attorney General,          )
                                             )
           Respondent.                       )
                                             )

**BEFORE:    KEITH, CLAY, and WHITE, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.**  Petitioner Bibata Boureima Mamane ("Mamane"), a native and citizen of Niger, petitions for review of a decision of the Board of Immigration Appeals ("BIA").  The BIA affirmed the dismissal of Mamane's applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  We **DENY** Mamane's petition for review.

## I.    BACKGROUND

The facts underlying Mamane's claim are controverted, as the Immigration Judge ("IJ") determined that her testimony was not credible.  Mamane testified to the following:

Mamane was born in Niger in 1986.  After her mother and father passed away in 2000 and 2003, respectively, she became the sole caregiver to her four siblings.  She and her siblings received assistance from a non-government organization called MICA; Mamane also volunteered for the organization.

In 2007, Mamane joined a human rights organization called Movement Participative for the Promotion for Human Rights and Democracy in Niger ("MPPDHD"). She testified that her job was to "emancipate the women in political agenda about their rights in Niger." She also testified that the purpose of MPPDHD was to "sensitize the Niger people about their right[s], [and] about [] democracy . . . ." Mamane's work with MPPDHD entailed traveling to rural regions of Niger to speak with and educate the village women about their rights. She would stay in the village until she finished speaking with all the women in the village, which could take one to three months.

Mamane testified that her problems with the police in Niger started in August 2009. However, she had previously testified that she came to the United States in March 2009 and had not left since then. She later changed her testimony and stated that her problems with the police in Niger began in August 2008. Mamane testified that in July 2008, MICA sponsored Mamane's travel from Niger to Chicago, Illinois, to attend a six-week conference that focused on the education of women. She returned to Niger in August 2008. Five days after her return to Niger, she began receiving text messages on her cell phone stating that if she did not stop her activity, presumably with MPPDHD, then she would be caught and "something" would be done to her. She could not identify the phone number sending the messages, and she testified that she did not understand what the sender meant or who the sender was. Mamane stated that she received the messages for approximately three months, but that at the time, she did not think there would be a problem. However, Mamane also testified that she showed the messages to people at MPPDHD and was told that they were "nothing." Mamane testified that she thereafter "dropped her cell phone in the water in Niger."

Mamane testified that on February 10, 2009, she was meeting with a group of women in the village of Gani Koara when the police arrived and immediately started shooting tear gas into the group. Mamane attempted to flee but was caught and beaten. She claims that the police beat her with sticks and kicked her. As the police beat her, they told her that they had been sending the text messages telling her to stop, but that she did not listen. After beating her in the village, about four police officers put her in their vehicle and drove her to another location. Once at the new location, the police continued to beat her and demanded that she remove her clothes. She initially refused, but after they continued to beat her, she complied, believing they would kill her. Mamane lost consciousness and does not recall what happened after she removed her clothes. She testified that she regained consciousness around 7:00 p.m. After she awoke, she put her clothes back on and started walking. She ran into a man who assisted her to a hospital.

Mamane testified that she went to the Talladje Doctor's Office, but the medical report noted that she was seen at the Regional Hospital Center of Niamey, not the Talladje Doctor's Office. After Mamane reported to the doctor what happened, he conducted an examination. Mamane testified that she suffered a bloody and swollen nose, cuts on her face and arms, and bruises all over her body. The written doctor's report that she received two weeks later, however, stated that the doctor only observed "nail scratching of the upper part of the thorax." A psychological report based on an evaluation conducted in the United States in 2012 noted that Mamane scratches herself. Mamane subsequently informed MPPDHD of the beating, and the organization urged her to keep working. She then changed her testimony and said that MPPDHD gave her the option of not going back to work. She continued to work for MPPDHD.

Mamane testified that she never reported the February 2009 incident to the police, but the IJ noted that the medical report regarding the incident stated that the chief of police was

responsible for having Mamane examined. Mamane testified that she did not know why the report would say that.

Mamane testified that on March 1, 2009, while she was meeting with a group of women in the village of Goudel, the police arrived. Again, they immediately started shooting tear gas into the crowd of women. Mamane attempted to flee but was unsuccessful. The police began to beat her with sticks and kick her, telling her that she had not listened to their advice. About four police officers then put her in their vehicle and drove to another location. Once at the second location, the police continued to beat Mamane. They demanded she remove her clothes. She initially refused, but complied after they continued to beat her. She lost consciousness after removing her clothes. She testified that it was around 7:00 p.m. when she woke up. When she awoke, she again found someone to assist her to a hospital. Mamane stated that she suffered a bloody and swollen nose, as wells as cuts to her arms, legs, and feet. However, the doctor's report from this incident stated that Mamane was seen for "general muscular pains." Mamane again informed MPPDHD about the beating. This time, the organization informed her that it feared for her life and advised her to leave Niger. Mamane's uncle, who worked for the police, informed her that he could not help her. He did, however, buy her a plane ticket to leave Niger. She arrived in New York on March 28, 2009, on a visitor visa.

On November 12, 2009, Mamane filed her application for asylum, withholding of removal, and protection under the CAT with the Department of Homeland Security. Mamane did not mention the March incident in her original application, although she did submit information regarding the March incident at a later date. Her application was referred to the Immigration Court with a Notice to Appear ("NTA") date of January 27, 2010. The IJ held a preliminary hearing on May 12, 2010, at which time Mamane admitted to the allegations in the

4

NTA and conceded removability. She renewed her request for asylum, withholding of removal, and protection under the CAT. On March 7, 2012, the IJ held a full evidentiary hearing.

On December 4, 2012, the IJ denied all forms of relief and ordered Mamane's removal to Niger. In denying Mamane's application, the IJ found that "overall [Mamane] [was] not a credible witness." Specifically, the IJ took issue with what he characterized as Mamane's unresponsive, implausible, inconsistent, or conflicting testimony. The IJ cited several reasons to support the finding: (1) the inconsistency between the injuries Mamane testified that she suffered from the February and March incidents and the injuries indicated in her medical record evidence; (2) Mamane's explanation of her age; (3) Mamane's inability to remember the full name of MICA; (4) Mamane's failure to mention in her original application the threatening text messages she claims that she received; (5) Mamane's failure to include the March incident in her original application; and (6) the factual similarities between the February and March incidents.

The IJ also concluded that pursuant to the REAL ID Act, Mamane had not provided reasonably available documentary corroboration, or explained its absence. In the IJ's judgment, Mamane should have been able to provide the following corroborative evidence: (1) statements from Mamane's siblings describing the injuries that she sustained in either of the February or March incidents since Mamane testified to their knowledge of the beatings and her injuries; (2) a statement from Boubacer Issoufou, president and founding member of MPPDHD, whom Mamane claimed to know personally, claimed was aware of the attacks, and with whom she had recently spoken; (3) a statement from MICA corroborating Mamane's claim that she received assistance from, and volunteered for, the organization; (4) a statement from MPPDHD confirming Mamane's membership since 2007; and (5) a statement by an identifiable person at

MPPDHD that could corroborate Mamane's membership and employment with MPPDHD, or her injuries from the February and March incidents.

Mamane submitted various forms of documentation, including an email purporting to be from the MPPDHD and an email from her siblings. The IJ questioned the authenticity of the email purporting to be from the MPPDHD because it did not "give the identity of the sender." The IJ ultimately found this email to be unpersuasive, especially because it was not accompanied by corroborating statements from any coworkers at MPPDHD. With respect to the email from her siblings, although the siblings corroborated that Mamane was beaten in February and March of 2009, the IJ found the email unpersuasive because it did "not describe any injuries that [Mamane] sustained in either of the claimed incidents." The IJ further discredited Mamane's claim that the preparer told her not to include mention of the March incident in her original application.

The IJ further determined that Mamane could not sustain a claim based on past-persecution due to the IJ's finding that her testimony was not credible. Accordingly, the IJ determined that Mamane was not entitled to the benefit of a presumption of a well-founded fear of future persecution. He then concluded that Mamane could not establish a well-founded fear of future persecution due to changed country conditions. Specifically, the IJ found that: (1) Niger law now mandates that women fill at least one quarter of the senior government positions, and at least ten percent of the elected seats; (2) the government has programs in place to provide credit, clean water access and access to health services for women; and (3) there was no indication that women experienced discrimination in access to employment or discrimination in pay for similar work in the civil service. He concluded that the credible evidence in the record was insufficient

to support a reasonable possibility that Mamane would suffer future persecution in Niger on account of her advocacy for women's rights there.

After concluding that Mamane failed to meet the requisite level of proof to demonstrate eligibility for a grant of asylum, the IJ found that she necessarily did not meet the more stringent standard for a grant of withholding of removal. Finally, the IJ determined that Mamane had not "presented any evidence to establish that it [was] more likely than not that she would be subjected to torture in Niger by, at the instigation of[,] or with the consent or acquiescence of the government of Niger, a public official of that government[,] or a person acting in an official capacity." Accordingly, the IJ concluded that Mamane had not demonstrated eligibility for relief under the CAT. The IJ denied Mamane's application and ordered her removed to Niger.

The BIA adopted and affirmed the decision of the IJ, concluding that the IJ "based his adverse credibility finding on specific and cogent reasons." The BIA acknowledged Mamane's argument that she explained the inconsistencies and omissions in her testimony, but concluded that the argument did not persuade it that the IJ's adverse credibility finding was clearly erroneous. It also agreed with the IJ that Mamane had not submitted reasonably available corroborating evidence. Accordingly, the BIA dismissed Mamane's appeal.

## II. STANDARD OF REVIEW

"Because the BIA adopted and supplemented the IJ's decision, we review the opinion of the IJ in conjunction with the BIA's additional comments and discussion." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1149 (6th Cir. 2010). While this court reviews legal conclusions made by the BIA de novo, *see Karimijanaki v. Holder*, 579 F.3d 710, 714 (6th Cir. 2009), factual findings are reviewed for substantial evidence and "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting 8 U.S.C.

§ 1252(b)(4)(B)). "Credibility determinations are also reviewed for substantial evidence." *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014). The substantial evidence standard is deferential, and "we uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (internal quotation marks omitted).

## III.   DISCUSSION

### A. The IJ's Adverse Credibility Determination Defeats Mamane's Claim for Asylum Relief

#### 1.   *Legal Standard for Asylum Claims*

Mamane seeks review of the denial of her application for asylum. Asylum may be granted to an applicant if it is determined that the applicant is a "refugee." 8 U.S.C. § 1158(b)(1)(A). A "refugee" is defined as any person "who is unable or unwilling to return to [the person's country of nationality] 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1101(a)(42)(A)). The burden of proof rests on the applicant to establish that he or she is a refugee, and that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). The applicant's testimony alone may suffice to meet the applicant's burden, "if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii).

To establish a well-founded fear of persecution, the applicant must show: (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in

a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear. *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004). Thus, a well-founded fear of future persecution has both an objective and subjective component: "an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Id.* (citation omitted). "'Persecution' . . . requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998).

### 2. IJ's Adverse Credibility Determination

"An adverse credibility determination is fatal to claims for asylum [. . .], preventing such claims from being considered on their merits." *Slyusar*, 740 F.3d at 1072 (citing *Perlaska v. Holder*, 361 F. App'x 655, 661 & n.6 (6th Cir. 2010)). In assessing the applicant's testimony that she is a refugee because she has been or has a well-founded fear of being persecuted, an IJ may consider *any* inconsistency when making a credibility determination. *Lian Peng Chen v. Holder*, 601 F. App'x 432, 436 (6th Cir. 2015). The REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, which applies to "applications for asylum, withholding of removal, or other relief from removal filed on or after May 11, 2005," *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009), allows triers of fact to consider "any inaccuracies or falsehoods in [an applicant's] statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii). In

other words, the IJ can consider inaccuracies or falsehoods that are not material to the claim for asylum. *See id.*; *see also Harutyunyan v. Holder*, 512 F. App'x 548, 553 (6th Cir. 2013).

In the Sixth Circuit, "[a]dverse credibility determinations are conclusive unless any reasonable adjudicator would be compelled to make a contrary conclusion." *Slyusar*, 740 F.3d at 1073 (citing *El-Moussa*, 569 F.3d at 256). It is not enough that this court could conceivably make a contrary conclusion; rather, we must be compelled to do so. *See Singh v. Ashcroft*, 398 F.3d 396, 404 (6th Cir. 2005).

Mamane contends that she was persecuted due to her participation in the MPPDHD. She cites to the February and March incidents as evidence of her persecution. The IJ and BIA, however, found that Mamane's testimony was not credible, citing several inconsistencies. Mamane challenges the IJ's and BIA's adverse credibility determination, arguing that the IJ "completely ignored or misconstrued the evidence of record, ignored the objective realities of life in Niger, engaged in speculation, and was unreasonable and arbitrary in his analysis."

We therefore begin our analysis by reviewing the IJ's finding that Mamane lacked credibility. We consider each of the grounds relied upon by the IJ and adopted by the BIA in order to determine whether the adverse credibility determination was supported by substantial evidence, or whether a reasonable adjudicator would be compelled to conclude to the contrary. *Koulibaly v. Mukasey*, 541 F.3d 613, 619–20 (6th Cir. 2008).

>    a. *Inconsistency Between Mamane's Testimony and the Supporting Medical Documentation of Her Injuries Following the February and March Incidents*

In assessing Mamane's recount of the alleged attacks she suffered in February and March, the IJ concluded that Mamane's "testimony [was] seriously at odds with her medical evidence." Mamane testified that in both incidents, she had been beaten with wooden sticks and

10

kicked by four Niger police officers. She testified that she suffered an injury to her nose that caused bleeding and swelling, and that she suffered cuts on her face and arms, and bruises all over her body. The IJ noted that Mamane's medical evidence stated only that the treating doctor observed "nail scratching of the upper part of the thorax" from the first incident and "general muscular pains" from the second incident. The IJ concluded that

> it is implausible that if [Mamane] suffered two sessions of beatings administered by four police who beat her with sticks and kicked her that she would only suffer "nail scratching of the upper part of the thorax," as [the] medical evidence recites. It is equally implausible in the judgement of the Court that [Mamane] would have suffered only minor cuts and bruises and a bloody nose as she testified.

Likewise, the IJ found it "implausible that such a person would suffer only 'general muscular pains' as stated in [Mamane's] supporting medical documents regarding the second incident." Further, a psychological report in the record noted that Mamane scratches herself.

On appeal to this court, Mamane attempts to explain these inconsistencies. She argues that the discrepancy is a result of political influence. She contends that the medical report was ordered by the chief of police because of the allegation of police brutality, and thus, was subject to political factors and political influence. Mamane insists that because the police in Niger operate with widespread impunity, the "doctor or higher ups could indeed be reluctant to contribute to making the case against the police." Consequently, she argues, the medical report does not truly reflect the pertinent information.

In our view, Mamane's explanation is pure conjecture. The IJ relied on the corroborating evidence that Mamane herself provided to find that her medical evidence was inconsistent with her testimony. To accept her explanation would necessarily require us to ignore the record evidence, and believe, in our opinion, a questionable theoretical explanation. Furthermore, when cross-examined about this inconsistency during her merits hearing, Mamane did not offer the explanation that she now offers to this court. Instead, she testified that she did not know why the

doctor did not include all of her injuries on the medical report, and that in Africa, doctors do not care about details or patients. She also testified that she never reported these incidents to the police, and offers no explanation as to why the chief of police would order her medical records. We find that here, "[t]he record is replete with inconsistencies in [Mamane's] testimony[.]" *See Lian Peng Chen v. Holder*, 601 F. App'x 432, 437 (6th Cir. 2015) (affirming IJ's adverse credibility determination where the record was replete with both major and incidental inconsistencies). The IJ properly found significant inconsistencies on this issue that discredited Mamane's testimony. *See id.*

### b. Mamane's Explanation of Her Age & Mamane's Inability to Remember the Full Name of MICA

The IJ took issue with the fact that both of Mamane's medical exhibits refer to Mamane as a twenty-three-year-old, when she was only twenty-two years old at the time she went to the hospital. Mamane explained that, in Niger, people do not wait for the actual month of the birth date, but rather, count the year instead. The IJ found this explanation unpersuasive.

Additionally, when Mamane testified, she could not recall what the acronym "MICA" stood for. She recalled that the "M" stood for "Micro" and that the "I" stood for "International," but could not recall the "C" nor the "A." She was able to recall the names of the people at MICA who helped her attend the conference in Chicago. However, the IJ concluded that it was "not believable" that Mamane could not recall what MICA stood for, although she claimed to have received services from the organization, and even volunteered there for nearly two years. The IJ's finding suggests that it doubted Mamane's involvement with MICA, or that MICA even existed.

In our view, the discrepancies in Mamane's age and her inability to recall the full name of MICA do not pose significant issues in terms of Mamane's credibility. Her age at the time of

the offense is of little significance where the age discrepancy was only a one year difference. Additionally, it is not completely unlikely that one would not be able to recall what the letters of an acronym stand for, particularly if the acronym is the typical way by which the organization is referenced. While Mamane could not recall what the last two letters of the acronym stand for, she could specifically recall the names of people from MICA that assisted her with her travels to Chicago.

However, these inconsistencies, though immaterial, lend support to the IJ's reservations about Mamane's credibility. *See* 8 U.S.C. § 1158(b)(1)(B)(iii) (noting that the IJ can rely on inconsistencies relating to irrelevant or immaterial matters in making an adverse credibility finding). We have found substantial evidence to support an IJ's adverse credibility finding even where half of the inconsistencies relied upon by the IJ were "relatively inconsequential." *See Seo v. Holder*, 533 F. App'x 605, 611−12 (6th Cir. 2013). We find this reasoning applicable here, where even though some of the inconsistences regarding Mamane's credibility are immaterial, we cannot say that under these circumstances "a 'reasonable adjudicator would be compelled to conclude to the contrary.'" *See Yu v. Ashcroft*, 364 F.3d 700, 704 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)).

### c. *Mamane's Failure to Mention the Text Messages in Her Original Application*

The IJ noted that in Mamane's original application, there was no mention of the text messages she claimed that she received on her cell phone in August of 2008. Mamane explained that she did think that the messages were important, and that she informed the asylum officer of the messages. She also testified that she showed these text messages to members of the MPPDHD, but that she subsequently dropped her phone in water in Niger. The IJ properly found this explanation unpersuasive. *Cf. Rudzevich v. Holder*, 344 F. App'x 201, 206 (6th Cir.

13

2009) (noting that an applicant's "explanation that he 'threw away' the threatening letters" supporting his asylum claim was "unpersuasive").

### d. Mamane's Failure to Include the March Incident in Her Original Application

The IJ found that there was no mention of the March beating in Mamane's original application. Mamane explained that she informed the person preparing her application about this beating, but they responded that there was no more space to write anything else; they advised her to inform the asylum officer of the incident instead, which she testified that she did.

We note that the IJ misconstrued Mamane's explanation when it concluded that "[Mamane's] claim that the preparer told her not to include any mention of this incident in her original [application] is not persuasive." Mamane did not testify that she was told *not* to include the incident in her application, but rather, that there was no space to include the details of the incident. Additionally, prior to the hearing, Mamane filed a "Correction/Clarification on I-589" form that detailed the events of the March incident. Nonetheless, the incident was, in fact, omitted from Mamane's original application, and the IJ is not required to accept Mamane's unsupported explanation in contravention of this fact. Failing to mention a material fact at the outset has been considered a "major" inconsistency. *Yu*, 364 F.3d at 703−04. Accordingly, this omission lends support for the IJ's adverse credibility finding.

### e. Factual Similarities Between the February and March Incidents

The IJ found a "strong suggestion of fabrication" in Mamane's testimony regarding the two incidents, stating that Mamane's testimony "related facts that were nearly word for word identical." For example, when Mamane lost consciousness during the first incident she testified that she regained consciousness around 7:00 p.m. When she lost consciousness weeks later during the second incident she testified that she again regained consciousness around 7:00 p.m.

14

This seems implausible. *See Ying Chen v. Holder*, 580 F. App'x 332, 340 (6th Cir. 2014) (noting that the IJ was properly "troubled" by aspects of the applicant's story that seemed "implausible").

Mamane countered that her testimony showed that there were significant differences. She noted that the events took place in two separate villages and that the second incident contained 50–60 women, whereas the first incident contained only 50 women. She also stated that at the first incident, the police told her that she had not listened to their threats and they were going to beat her until she died; at the second incident, however, the police told her that she still had not listened, and that the next time, they would not stop at beating her, but would instead kill her. Finally, she noted that in the second incident, she removed her clothes more promptly than she had in the first incident. Mamane argues that these differences are significant, and that it would be less credible if the police actions dramatically differed. She maintains that her testimony is not only internally consistent, but also consistent with known behavior of the Niger police.

We, too, are troubled with Mamane's recount of the February and March incidents. While certain aspects of the incidents are likely to have occurred in the same manner (i.e., that the police arrived and immediately shot tear gas into the crowd, and that they beat her and drove her to another location), it seems unlikely that even the smallest details would be the same (i.e., the number of police officers that drove her to the second location, that the police beat her with sticks and kicked her, that she suffered a bloody nose in both incidents, that she does not remember what happened after she removed her clothes because she lost consciousness, and that she regained consciousness around exactly the same time). Accordingly, we will not disturb this finding.

Overall, the IJ found numerous inconsistencies between Mamane's testimony and the information she provided in support of her application. Although Mamane attempts to provide explanations for these inconsistencies, and although we may believe some of these explanations to be plausible, the record does not contain evidence that would compel a contrary conclusion. And because the IJ enjoys considerable deference in credibility determinations, we are bound by its determinations in the absence of evidence that compels a contrary conclusion.

We note, however, that in some cases, what the IJ characterized as Mamane's unresponsive testimony appears to be a communicative misunderstanding rather than a willful refusal to answer. While "the credibility determination no longer includes a requirement that the inconsistency be material to" the asylum claim, we again "urge [IJs, the BIA, and] courts to remember that any inconsistencies or inaccuracies must always be considered in light of the 'totality of the circumstances.'" *Slyusar*, 740 F.3d at 1074. But that we may have decided this case differently is not enough for us to grant Mamane's petition. *See Ying Chen*, 580 F. App'x at 336. The record as a whole in this case demonstrates that the BIA did not err in upholding the IJ's adverse credibility determination because that finding was supported by substantial evidence. Accordingly, we affirm the IJ's adverse credibility determination, and conclude that Mamane's adverse credibility determination defeats her asylum claim.

### B. Mamane's Corroborating Evidence

We also agree with the IJ that Mamane failed to provide reasonably available corroborating evidence in support of her application and testimony. "The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C.

§ 1158(b)(1)(B)(ii). "Whenever the trier of fact determines that corroboration is necessary, 'such evidence must be provided unless the applicant demonstrates that the applicant does not have the evidence and cannot reasonably obtain the evidence." *Ying Chen*, 580 F. App'x at 341 (quoting 8 U.S.C. § 1229a(c)(4)(B)).

As the IJ noted, Mamane had over sixteen months to obtain this corroborating evidence from her siblings, former employer, and co-workers. In addition, Mamane testified that she regularly speaks with her siblings, yet the email from her siblings failed to "describe any injuries that" Mamane "sustained in either of the claimed incidents." And the email Mamane submitted purporting to be from the MPPDHD did little to support Mamane's testimony because it did not give the identity of the sender, despite Mamane's testimony that she knew the president of the MPPDHD personally and had spoken to him just a few months prior to the hearing. *See id.* at 342 (noting that in this circuit, "supporting documentation is reasonably available if it is of the type that would normally be created or available in the particular country and is accessible to the alien, such as through friends, relatives, or co-workers." (internal quotation marks and citation omitted)). Mamane failed to provide evidence sufficient to compel a conclusion contrary to the IJ's conclusion. Thus, the IJ properly concluded that Mamane's failure to provide sufficient corroborating evidence to support her application and testimony warranted denial of her request for relief. *See id.*

Because the IJ found Mamane's testimony not credible and because Mamane failed to thereafter provide corroborating evidence sufficient to overcome the adverse credibility determination, her claim of future persecution is foreclosed. Given the adverse credibility finding, Mamane cannot establish a reasonable fear of future persecution. *See Hachem v. Holder*, 656 F.3d 430, 435 (6th Cir. 2011); *see also Ying Chen*, 580 F. App'x at 343; *Slyusar*,

17

740 F.3d at 1074 (an adverse credibility determination is "dispositive of [an] application for asylum").

### C. Mamane's Remaining Claims Also Fail as a Result of the Adverse Credibility Determination

Mamane also seeks relief for withholding of removal and protection under the CAT. An alien who seeks withholding of deportation from any country must show that his "life or freedom would be threatened in that country on account of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3). In order to make this showing, the alien must establish a "clear probability" of persecution on account of one of the enumerated grounds. *INS v. Stevic*, 467 U.S. 407, 413 (1984). This clear probability standard requires a showing that it is more likely than not that an alien would be subject to persecution if returned to the country from which he seeks withholding. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006). The standard for withholding of removal is more stringent than that of asylum. *Ben Hamida v. Gonzales*, 478 F.3d 734, 741 (6th Cir. 2007).

To qualify for protection under the CAT, an applicant must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004) (quoting 8 C.F.R. § 208.16(c)(2)).

As with asylum claims, however, "[b]efore making a decision on the merits of a claim . . . the IJ must determine whether the applicant is credible; an application deemed incredible will not be reviewed on the merits." *Slyusar*, 740 F.3d at 1074. "Facts relevant to credibility determinations, denial of asylum applications, withholding of removal, and the CAT are all reviewed under [the] same standard." *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). Because the IJ found Mamane's testimony incredible and dispositive of her application for asylum, this adverse credibility determination necessarily defeats her applications for

withholding of removal and protection under the CAT.  *See Zhao v. Holder*, 569 F.3d 238, 249 (6th Cir. 2009) ("Since [petitioner] has failed to satisfy the threshold showing of credibility to warrant withholding of removal under the Act, it logically follows that he cannot demonstrate that he is entitled to relief under the CAT.").

## IV.    CONCLUSION

For the reasons stated above, we **DENY** Mamane's petition for review.

**HELENE N. WHITE, Circuit Judge, dissenting.** I respectfully dissent. I conclude that the IJ's adverse credibility determination was unsupported by substantial evidence. As to corroborating evidence, the IJ imposed an overly-stringent standard instead of the "reasonably available corroboration" standard. *See Lin v. Holder*, 565 F.3d 971, 977 (6th Cir. 2009). The IJ disbelieved that Mamane was a volunteer for Micro Credit in Africa (MICA), the non-governmental organization that assisted her and her siblings after they were orphaned, because Mamane could not recall what the last two letters of the English acronym stood for.[1] The IJ disregarded that it was Mamane's work for MPPDHD, not MICA, that was central to her claim, and that Mamane recalled the names of the two individuals at MICA who facilitated her attending the conference in Chicago in 2008.

The IJ was also troubled by the fact that Mamane's original application stated that she received menacing *calls* but did not mention text messages. Mamane testified that she told the asylum officer that she received both menacing calls and text messages when she returned to Niger from Chicago. This trivial inconsistency does not support an adverse credibility finding. The point is that Mamane received menacing communications on her phone, whether calls or text messages.

The IJ also discounted the corroborating evidence Mamane presented regarding her work for MPPDHD because it came from the organization itself rather than from its president directly. "[W]here it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided." *Dorosh v. Ashcroft*,

---

[1] Mamane made two corrections to her asylum application before the merits hearing; that she was a volunteer, not a paid employee, for MICA, and that a second police beating occurred. Mamane testified that she told the person assisting her with her application of the second beating and he responded that there was insufficient space to include it. She also testified that she told the asylum officer. A.R. 182.

20

398 F.3d 379, 382 (6th Cir. 2004). Mamane more than met this standard by producing a copy of her MPPDHD identification card and an email message from MPPDHD stating that she worked as a teacher of women in rural villages, taught them literacy skills,[2] urged them to vote in elections and not to turn their votes over to their husbands, and encouraged them to send their daughters to schools. A.R. 345. The email from MPPDHD also discussed the police beatings of Mamane in February and March 2009, stated that a week after the March beating, two of Mamane's co-workers disappeared, and further stated that MPPDHD urged Mamane to leave Niger because her life was at risk. A.R. 345. That the MPPDHD email did not come directly from the organization's president does not diminish its corroborative value.

Mamane also submitted an email from her siblings discussing her work for MPPDHD and stating that she returned home after the police beatings in February and March 2009 "beaten, tortured, and humiliated." A.R. 347. The IJ criticized this email for providing insufficient detail regarding Mamane's injuries. Beyond that, the IJ disbelieved that the police beatings[3] occurred because of the inconsistency between the medical records and Mamane's testimony regarding her injuries and because of the similarity in Mamane's descriptions of the two beatings.

As we observed in *Slyusar v. Holder*, 740 F.3d 1068, 1074–75 (6th Cir. 2014):

> [W]e wish to emphasize that "[a]lthough the REAL ID Act expands the bases on which an IJ may rest an adverse credibility determination, it does not give a blank check to the IJ enabling him or her to insulate an adverse credibility determination from our review of the reasonableness of that determination." *Ren* [*v. Holder*], 648 F.3d [1079,] 1084 (9th Cir. 2011) (quotation omitted). As the *Ren* Court recognized, "victims of abuse often confuse the details of particular incidents, including the time or dates of particular assaults and which specific actions occurred on which specific occasion; thus, the ability to recall precise dates of events years after they happen is an extremely poor test of how truthful a witness's substantive account is." *Id*. at 1085–86 (internal citations and quotation marks omitted).

---

[2] As of 2008, the literacy rate for women in Niger was 17%.
[3] The Niger 2010 country report states that the police operate with impunity and disregard the law regarding arbitrary arrest and detention.

21

The Ninth Circuit in *Ren* further observed:

> Although the REAL ID Act now gives immigration judges the power to consider any inconsistency in evaluating an applicant's credibility, the power to consider any inconsistency "is quite distinct from the issue of whether the inconsistencies cited support an adverse credibility determination." *Shrestha* [*v. Holder*], 590 F.3d [1034,] 1043 [(9th Cir. 2010)]. (quoting Scott Rempell, Credibility Assessments and the REAL ID Act's Amendments to Immigration Law, 44 Tex. Int'l L.J. 185, 206 (2008)). [T]o support an adverse credibility determination, an inconsistency must not be trivial and must have some bearing on the petitioner's veracity. *Id*. at 1044.

*Ren*, 648 F.3d at 1086.

Mamane testified that the doctor who attended her after the police beatings explained that because she reported that the police had beaten her he was obligated to notify the police. The medical reports submitted to the IJ state *on their face* that the local police chief ordered the exams. Both medical reports state that Mamane was a "victim of Voluntary Beatings and Wounds (CBV)," thus corroborating that Mamane reported the incidents and sought treatment; the first lists her injuries as "PURPURA due to nail scratching of the upper part of the thorax"; the second reports "general muscular pain." It is not surprising that the reports ordered by the police in response to an accusation of police beatings would minimize Mamane's injuries. Both the MPPDHD and Mamane's siblings corroborated that Mamane was seriously injured by the two police beatings. Finally, that the two police beatings were similar is not implausible and as we have observed, "victims of abuse often confuse the details of particular incidents." *Slyusar*, 740 F.3d at 1075 (quoting *Ren*, 648 F.3d at 1085–86).

The IJ also found further reason to doubt Mamane in the one-year discrepancy in her age as stated in the medical reports,[4] disregarding Mamane's plausible explanation that many Africans add a year to their age once January of the year arrives.

---

[4] The medical reports of February and March of 2009 both list Mamane's age as 23, although she would actually have been 22, her birthday being October 15, 1986.

Because the IJ's adverse credibility determination rested largely on trivial inconsistencies, I would vacate the BIA's decision affirming the IJ and remand.