# District of Columbia
# Court of Appeals

**No. 15-CO-36**

JOEL CASTON,

<div align="center">Appellant,</div>



FILED

SEP **29** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

<div align="right">**FEL-11733-94**</div>

UNITED STATES,

<div align="center">Appellee.</div>

<div align="center">

On Appeal from the Superior Court of the District of Columbia
Criminal Division

</div>

BEFORE: THOMPSON and EASTERLY, *Associate Judges*; and KRAVITZ, *Associate Judge, Superior Court of the District of Columbia.*[*]

<div align="center">

**J U D G M E N T**

</div>

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's order is vacated, and the matter is remanded for further proceedings consistent with this opinion.

<div align="center" style="margin-left:50%">

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

</div>

Dated: September 29, 2016.

Opinion by Associate Judge Phyllis D. Thompson.

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CO-36

JOEL CASTON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(FEL-11733-94)

(Hon. Gregory Jackson, Post-Conviction Motion Judge)

(Argued January 19, 2016                        Decided September 29, 2016)

*Jonathan Zucker*, with whom *Patricia Daus* was on the brief, for appellant.

*Christopher Macchiaroli*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Frederick Yette*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and KRAVITZ, *Associate Judge, Superior Court of the District of Columbia*.[*]

THOMPSON, *Associate Judge*: In 1996, a jury convicted appellant of the

August 1994 fatal shooting of Rafique Washington and of related weapons

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

offenses. In December 2011, after this court had affirmed appellant's convictions on direct appeal and subsequently affirmed the denial of his motion filed pursuant to D.C. Code § 23-110 (2001),[1] appellant filed a motion to vacate his convictions under the provisions of the Innocence Protection Act codified at D.C. Code § 22-4135 (2001) (the "IPA"). The trial court held an evidentiary hearing on the IPA motion and thereafter denied the motion, stating that it could not "find that it is *more likely than not* that [appellant] is actually innocent of the crime." This appeal followed.

Appellant asserts numerous claims of error, several of which we reject. As explained in more detail below, however, in denying appellant's IPA motion, the Superior Court judge (1) seemed, mistakenly, to regard new evidence that was presented — an affidavit and hearing testimony from a putative eyewitness to the murder who stated that appellant was not the shooter — as mere "impeachment evidence" that is inadequate to warrant relief under the IPA; (2) discredited that

---

[1] *Caston v. United States*, No. 96-CF-1954, Mem. Op. & J. (D.C. Feb. 20, 2002) (rejecting appellant's argument that the trial court abused its discretion in allowing the jury to learn of his involvement in drug sales two days after the murder); *Caston v. United States*, No. 04-CO-0877, Mem. Op. & J. (D.C. May 24, 2005) (affirming the trial court's ruling that appellant's motion, which was not filed during the pendency of his direct appeal, and which claimed that trial counsel failed to call three requested alibi witnesses and a purported eyewitness ("Ms. Pat") and also failed to interview or contact some witnesses prior to trial, was procedurally defaulted).

witness's statements on the basis of inconsistencies between statements contained in his affidavit and in his hearing testimony, without regard to whether the inconsistencies were trivial or insignificant and whether they were explainable; (3) did not critically examine the weight of the trial evidence; and (4) contrary to this court's guidance in *Bouknight v. United States*, 867 A.2d 245 (D.C. 2005), appears ultimately to have adjudged the credibility of the (putative) eyewitness's testimony in light of the court's adverse determination about appellant's own credibility. While we accord "great deference to the trial court's role as the trier of fact on the ultimate issue of 'actual innocence' under the IPA," *Richardson v. United States*, 8 A.3d 1245, 1249 (D.C. 2010), we cannot be confident that, had the judge's decision not been influenced by the foregoing factors, he would have reached the same conclusion about the likelihood that appellant is "actually innocent of the crime." Accordingly, we remand the matter to the trial court for reconsideration in light of this opinion.

## I. The Evidence at Appellant's Trial[2]

The evidence at appellant's 1996 trial (on the charge of first-degree murder and related weapons charges) established that on the evening of August 14, 1994, Washington was shot and killed in front of the New China Carry Out (the "carryout") at the corner of 16th Street and Good Hope Road, S.E. Government witness Edward Thompson testified that on that evening, he rode to the carryout with Washington, a man named "Gene," and driver "Mark." After the group had made their purchases, Thompson walked across the street to use a payphone, leaving Washington, Gene, and Mark standing on the steps in front of the carryout. Thompson returned a few minutes later and asked the others to get into the nearby car so they could leave. As Thompson was trying to open the car door, he heard a gunshot and saw Washington fall in front of the carryout's front door. Thompson testified that he then saw appellant "c[o]me from out the shadow of the carryout,"

---

[2] Appellant did not provide us with the transcripts of his trial, but, with the exception of the transcript of October 15, 1996 (apparently the last day of trial, when defense counsel was expected to call Thompson back to the witness stand to question him about a possible "deal" with the government) we have been able to review the trial transcripts from (microfilmed) archived records. The government has summarized the trial record and pertinent grand jury testimony in its brief, without dispute from appellant, and we assume that there is nothing in the October 15, 1996, transcript (or in the grand jury transcripts, which we also do not have) that renders the summary of the trial evidence that follows materially inadequate or misleading.

run toward Washington, place a revolver inches from Washington's body, almost touching Washington's head, and fire "about five" additional shots.[3]  Thompson testified initially that appellant was "standing over" Washington, but then explained that appellant was "steadily moving" while he was shooting, and "wasn't just standing in one spot when he was shooting" Washington.  Appellant then fled, and Thompson, Gene, Mark, a woman named Lazetta Uzzle, and Uzzle's boyfriend Kevin Molden (nicknamed "Half" or "Haf") all stood around Washington's body.  Thompson testified that he saw Half search through Washington's pockets, but that he did not know whether anything was taken.  Everyone fled the scene before the police arrived.  Thompson testified that, at some point before the shooting, Washington told him that he (Washington) "ha[d] a problem with [appellant]."[4]

---

[3]  A forensic pathologist testified that there were six gunshot wounds to Washington's body and that the soot around two of the wounds was consistent with the shots having been fired from between twelve and eighteen inches away as Washington lay on the ground.

[4]  Asked by defense counsel about whether, a couple of days before Washington was shot, someone had shot at Washington and Thompson "from across the street near the carryout," Thompson agreed that "somebody was shooting out there," but testified, "They weren't shooting at us[.]"

Uzzle also testified at trial. She told the jury that shortly before the shooting, she saw appellant, whom she had known her entire life, talking with another man inside 1641 W Street, S.E. Uzzle then walked north on 16th Street, looking for Washington so she could purchase cocaine from him. At some point, while standing at the intersection of 16th and U Streets with Half, Uzzle saw Washington drive by in a car, which also contained Thompson, Gene, and Mark. Washington told Uzzle and Half that he did not have any cocaine and then went into the carryout. Soon thereafter, Uzzle, who was then about a block away from the carryout, heard gunshots, but did not see who fired the shots.[5] She ran in the opposite direction of the gunshots, but at some point, turned around and headed back toward the carryout to join Half, whom she had seen run "towards the shot." Uzzle arrived at the carryout to see Half going through Washington's pockets. Gene was on the scene as well. Thompson ran past Uzzle and was behind the car, and Mark was standing nearby. Half took money out of Washington's pockets. Uzzle then ran back in the direction of the building where she had seen appellant earlier that evening. Uzzle explained that she ran from the scene because "Ha[l]f and [she] had just took the money off [Washington]" and she "didn't want to be around when the police came." Uzzle spotted appellant again and told him "to go

---

[5] Uzzle testified before the grand jury that she did not know "who actually did the shooting."

home" because Washington had just been killed and because appellant, who had fought with Washington a few weeks prior,[6] would be the prime suspect for the murder.

The government also presented evidence that two days after the shooting, police spotted appellant and two other men engaged in suspected narcotics activity. All three men were "holding their waistbands as if they had a gun." As officers approached, appellant and the other men fled and ran inside an apartment. Officers found two of the men "come from out of the hallway closet" and found two guns on the floor of the closet. An officer found appellant "peep[ing]" out from a closet in the nearby back bedroom. The officer did not see a gun in appellant's hand, but searched the closet and found a chrome .44 Magnum revolver sticking out from a shoebox that was on a shelf.[7] The Magnum revolver was tested for latent fingerprints, but none were found. A firearms expert testified that bullet fragments

---

[6] According to Uzzle's trial testimony, a couple of months before the shooting, appellant, Washington, D'Quinta Uzzle (Uzzle's son), and a man named Sean fought over a gun. Appellant and Washington exchanged punches. As Washington was driving away from the fight, appellant hung on to a door of the car, firing shots at it until he fell. Uzzle saw the the gun, which she "guess[ed] . . . was [appellant's]," fall on the ground. Uzzle testified that she believed the gun was a revolver.

[7] According to the government's brief, the owner of the apartment (Wendy Hursey, who was "unavailable" to testify at trial) testified before the grand jury that she did not own any guns or keep any ammunition in her apartment.

recovered from Washington's body and from the crime scene "were in fact fired through the barrel of th[e] .44 Magnum revolver[.]"

Finally, the government introduced evidence that about a week after the shooting, police executed a search warrant at appellant's mother's residence, where appellant also resided. Underneath appellant's mattress, police found a "speed loader" — a device used for rapidly loading ammunition into a firearm — containing six rounds of .44 caliber ammunition as well as additional rounds of ammunition.

## II.  The Affidavits and Hearing Testimony in Support of Appellant's IPA Motion

In support of his IPA motion, appellant submitted affidavits from Lloyd Rodgers, Uzzle, and Jermaine Brown. Appellant's counsel explained to the court (the Honorable Gregory Jackson) that after interviewing Rodgers, counsel had decided not to call him to testify at the IPA hearing because he "really couldn't elucidate much."

Rodgers stated in his affidavit that he was an eyewitness to the shooting on August 14, 1994. Specifically, he stated that he was inside the carryout ordering

food when he saw Washington, Gene, and Mark enter the carryout. After he exchanged greetings with the men, he left the carryout and noticed a "slim brown/dark-skinned guy dressed in all black wearing a baseball cap standing at the phone booth."[8] Before Rodgers could open the door of his parked car, he saw the three men exit the carryout, and then heard a gunshot. After taking cover, Rodgers saw the man from the phone booth standing over Washington and firing rounds into Washington's body before running off. After the shooter fled, Gene and Mark were standing there and "their buddy Eddy [presumably, Thompson]" ran over from across the street. According to Rodgers, "they" told him that the person who had shot Washington was Half. Rodgers stated in addition, "I know without a shadow of a doubt that the guy I saw commit this was not Joel Caston."

Uzzle, Brown, and appellant all testified at the hearing on appellant's IPA motion. Uzzle testified that, on the evening of the shooting, she was speaking with Washington about buying some cocaine when Half interrupted the conversation and began arguing with Washington about Uzzle's "having [had] sex with

---

[8] In contrast, in his affidavit, Brown described Half as "approximately five foot five inches with light brown skin, a large build and a shaved head."

[Washington]."[9]  According to Uzzle, Washington "pulled a gun out on Half[.]" Half retreated after Uzzle told the men that they needed to "cut that out," but Uzzle heard him say that "this wasn't the end of it, that he'll be back." Uzzle interpreted Half's words as meaning that Half "was going to get [Washington] for pulling [a] gun on him." Uzzle testified that Half then "ran up the street" toward where she and Half lived, and that she "knew he was running to go get a gun[.]" A little while later, Uzzle heard gunshots coming from the direction in which Half had run. When Uzzle ran in that direction and arrived on the scene, she saw Half putting a gun inside his pants as he stood over Washington's body, went through Washington's pockets, and took money and drugs.[10] Half then ran off and Uzzle followed him. While running back to her residence, Uzzle saw appellant (whom she regarded as a son and referred to as her "nephew," although he was not related

---

[9]  This testimony was in contrast to Uzzle's grand jury testimony that Half did not "do any talking at that time." Also at trial, Uzzle answered, "No" to the question, "Isn't it a fact that Ha[l]f was upset with [Washington] because he tried to get some cocaine from you and he refused?"

At trial, Uzzle testified that Washington was in a car at the time of the conversation; during the IPA hearing, she testified that Washington was on foot.

[10]  This was in contrast to Uzzle's grand jury testimony that she and Half "walked across the street together over to the body."

by blood) about four or five blocks from the scene of the murder.[11] She did not see appellant "near the murder," and she testified that there was "no way that he could have . . . left from the scene of the crime" and arrived at where she saw him blocks away unless he was "Superman." Uzzle told appellant that he should go home because Washington had just been shot and appellant would be the "first one . . . blamed" because of the fight he and Washington had had two weeks earlier. Appellant was "surprised" to hear about the shooting.[12] Later in the evening, when Uzzle and Half were both in their home again, Uzzle asked Half what he had done, and Half responded, "I killed him, don't worry about it, he's dead."[13] Uzzle testified that Half subsequently was killed and that she was told that Washington's brother "killed Half for killing [Washington]." Uzzle relocated to Louisiana after Half's death because she was "scared that [Washington's brother] was going to come looking for [her] [be]cause [she] knew that he had killed Half."

---

[11] Unlike in her grand jury and trial testimony, Uzzle testified that she saw appellant that evening only after the shooting.

[12] At trial, too, Uzzle testified that appellant was "surprised" to hear of the shooting.

[13] Uzzle also testified that Half was murdered not long after the shooting; The court noted that Half died in March 1995 (before appellant's trial).

Uzzle testified that after she moved to Louisiana, she had contact with appellant's family a "couple of times," six or seven years after appellant's trial, and, at some point, talked with some of appellant's family members about what she knew about the murder and Half's role in it. She had ceased having contact with them for many years because she had been a government witness. She testified that she did not tell the police about what Half did because she was afraid she could go to jail for helping to smoke the cocaine and spend the money Half took from Washington. She further testified that she did not tell the police that Half shot Washington, even though she knew that appellant was suspected of the murder, because she believed that telling the police that appellant was blocks away and could not have been the shooter "would have been enough for them not to lock him up." She also agreed that her 30 or 40 years of substance abuse on and off had affected her memory "[a] whole lot."

Brown testified at the IPA hearing that on August 14, 1994, when he was fifteen years old and when it was dark outside, he was walking toward his uncle's house after leaving a friend's home where he had been playing video games, when he saw Half, whom he knew from "hang[ing] out" at the carryout, "shooting off at some people" ("probably — like three males and one girl") who were "coming

outside the carryout."[14] At one point Brown testified that Half was "not even like five feet away from" the carryout door when he started shooting, but at another point agreed that Half was about 17 feet away from the carryout door when he started shooting. Brown saw "sparks come out" and saw a man fall. Brown testified on direct that he did not see Half do anything further with the gun and did not see anything else Half did while the man was on the ground. On cross-examination, however, asked about the statement in his affidavit that he rose up from behind the car he was hiding behind and watched Half walk up and fire more shots at the man,[15] Brown testified that when Half was shooting, "he's still walking up on him. Not like he's just standing there."[16] Brown further testified that he ducked behind a car after seeing the shooting, but ran when he saw Half coming his way. When Brown went to his uncle's house and reported to his uncle and mother what he had seen, his mother told him to say nothing about it. Brown told

---

[14] Brown acknowledged that he had convictions for possession with intent to distribute cocaine while armed, possession of a firearm during a crime of violence, unlawful possession of ammunition, possession of an unregistered firearm, carrying a pistol without a license, escape from an institution, destruction of property, unauthorized use of a motor vehicle, and motor vehicle unlawful taking, and also had a Bail Reform Act conviction.

[15] When the prosecutor said on cross-examination, "That didn't happen, did it," Brown replied, "If I said it happened[,] it had to have happened."

[16] As described above, Thompson testified at trial that the shooter was "steadily moving" while he was shooting, and "wasn't just standing in one spot when he was shooting" at Washington.

no one else about what he had seen and did not return to the neighborhood. Brown testified that he did not know appellant "back then," that he did not know who appellant was prior to his walking into the courtroom, and that he became involved in this matter only after reconnecting with appellant's niece Rashida in 2009, after running into her at the "food stamp place"; Rashida and Brown had been close friends during the 1992-94 period, but, according to Brown, he had not seen her since then. When Rashida and Brown saw each other in 2009, she asked Brown why he had stopped coming to the neighborhood, and he told her about the shooting he had witnessed at the carryout. Appellant's sister thereafter showed Brown a photograph of appellant, and Brown told her that appellant was not at the scene of the shooting. After speaking with appellant's sister, Brown spoke with an investigator, who typed the affidavit for his signature.

Appellant, who did not testify during his trial, was the final witness at the IPA hearing.[17] He denied being present when Washington was murdered, denied playing any role in the murder, and denied having any contact with the firearm reportedly used in the shooting. He also testified that his altercation with Washington a few months prior to the shooting was a mere "verbal dispute."

---

[17] Appellant acknowledged on cross-examination that he had other convictions, for robbery and assault to avoid apprehension.

Appellant further testified that he did not recall any conversation with Uzzle about the potential that he would be a suspect in Washington's murder. He explained that he was one of a number of men in the neighborhood who were "allowed to hang out" in the apartment where police found him and the alleged murder weapon; that Half was one of the men who hung out there and was there, in the back bedroom, on August 16, 1994, the day police found the alleged murder weapon in a closet in the apartment's back room; and that he (appellant) was not in a closet in that bedroom. He further testified that he had never met Brown before seeing him in the courtroom. As to Uzzle, appellant testified that he first learned that she had been at or near the scene of the murder when she testified at trial. He acknowledged that after his arrest, he did not try to contact her or ask his lawyer, family, or anyone else to contact her before or during trial or prior to 2009.

After the IPA hearing, the Superior Court judge issued a written order explaining as to each of the witnesses why his or her testimony did not warrant a new trial. We discuss the court's reasoning in Parts IV and V below.

## III. Applicable Law

In relevant part, the IPA provides that "at any time," "[a] person convicted of a criminal offense in the Superior Court . . . may move the court to vacate the conviction or to grant a new trial on the grounds of actual innocence based on new evidence." D.C. Code §§ 22-4135 (a) and (b) (2012 Repl.).[18] The motion must "set forth specific, non-conclusory facts" and must identify the specific new evidence, establish how it demonstrates the movant's actual innocence, and establish why the evidence is "not cumulative or impeaching." § 22-4135 (c)(1)-(3). As relevant in this case, "new evidence" is evidence that "[w]as not personally known and could not, in the exercise of reasonable diligence, have been personally known to the movant at the time of the trial or the plea proceeding[.]" D.C. Code § 22-4131 (7)(A).[19] In determining whether to grant relief, the trial court "may consider any relevant evidence, but shall consider the following: (A) The new evidence; (B) How the new evidence demonstrates actual innocence; (C) Why the

---

[18] The IPA also contains provisions pertaining to pre- and post-conviction DNA testing that are not relevant here. *See* D.C. Code §§ 22-4132 and 22-4133.

[19] "The new evidence provision of the IPA is broader and more inclusive than the judicial test for newly discovered evidence under Super. Ct. Crim. R. 33, as the IPA specifically provides for evidence that was known at the time of trial but could not be produced . . . . However, the diligence requirements in the IPA and Rule 33 are the same, as both require 'reasonable' or 'due' diligence." *Bouknight*, 867 A.2d at 255.

new evidence is or is not cumulative or impeaching[.]" § 22-4135 (g)(1)(A)-(C). The motion must also include an affidavit by the movant stating, under penalty of perjury, that the movant "is actually innocent of the crime that is the subject of the motion, and that the new evidence was not deliberately withheld by the movant for purposes of strategic advantage." § 22-4135 (d)(1). If, after considering those factors, "the court concludes that it is more likely than not that the movant is actually innocent of the crime, the court shall grant a new trial." § 22-4135 (g)(2). If the court "concludes by clear and convincing evidence that the movant is actually innocent of the crime, the court shall vacate the conviction and dismiss the relevant count with prejudice." § 22-4135 (g)(3).

This court reviews the denial of a motion to vacate a conviction or for a new trial under the IPA for abuse of discretion. *See Richardson*, 8 A.3d at 1248. "[W]e must give great deference to the trial court's role as the trier of fact on the ultimate issue of 'actual innocence' under the IPA, and thus we apply the clearly erroneous standard of review to the trial judge's rejection of alleged newly discovered evidence offered to prove 'actual innocence.'" *Id.* at 1249 (citation omitted). "Accordingly, the scope of our review is narrow, both on the question whether appellant has been diligent in proffering 'new evidence' and whether that evidence establishes appellant's 'actual innocence.'" *Id.* That said, "[t]he statutory

construct itself fully accommodates consideration of the [IPA] movant's credibility." *Bouknight*, 867 A.2d at 258. For that reason, this court will evaluate whether the trial court has "unnecessar[il]y and inappropriate[ly] . . . depart[ed] from that construct by recognizing [the movant's] credibility as a separate basis for [denying an IPA motion], independent of the considerations set forth by the statute." *Id.*

## IV. The Motion Court's Analysis

The court found that Rodgers' proffered testimony did not qualify as "new evidence" within the meaning of the IPA because, even though Rodgers purportedly "made himself known to multiple individuals . . . on the scene at the time of the murder," appellant failed to establish "what prevented him from obtaining Mr. Rodgers' testimony sooner." The court further found that the inconsistency between Rodgers' physical description of the shooter and Brown's physical description of the shooter called into doubt the reliability of Rodgers' testimony and his "ability to perceive the events that night."

As to Uzzle's testimony, the court concluded that it, too, was not "new evidence." The court emphasized that appellant was aware by the time Uzzle

testified at trial, if not before, that "she had information about this offense[,]" i.e., "first-hand knowledge of the circumstances related to the murder of Mr. Washington." Yet, the court observed, despite appellant's "close personal and family ties" with Uzzle, "there is no indication that [he] did anything to discover at that time the purported exculpatory evidence that [Uzzle] now proffers." The court found that "it would have taken minimal effort for [appellant] to contact Ms. Uzzle and obtain th[e] favorable testimony she now purports to offer[,]" but that the record gave no indication that either appellant or his counsel "ever attempted to contact her or obtain her testimony."

The court also found that Uzzle's affidavit and IPA hearing testimony constituted — "at best" — "[i]mpeachment evidence [that] alone is insufficient to establish a claim for relief under the IPA." In addition, citing inconsistencies between Uzzle's trial and IPA hearing testimony, the court found that her hearing testimony was "not sufficiently credible to show that 'it is more likely than not that [appellant] is actually innocent[.]'"[20]

---

[20] The court noted that Uzzle's first mention of the altercation between Washington and Half on the night of the shooting came in her affidavit and IPA hearing testimony, a "critically significant fact[]" that she could not have simply overlooked had it been true. The court also observed that, in her grand jury and trial testimony, Uzzle denied ever seeing Half with a gun, but claimed the opposite in her affidavit and hearing testimony.

The court was satisfied that Brown's testimony sufficed as new evidence, finding "nothing to suggest that the exercise of due diligence would have identified Mr. Brown any sooner." However, the court found that appellant had not shown that Uzzle's and Rodgers' testimony, "along with that of Mr. Brown[,] is more than mere impeachment evidence[.]" In addition, the court focused on the "inconsistent and contradicted accounts" set out in Brown's affidavit and his hearing testimony, matters that the judge said "seriously undermine [Brown's] credibility" and that led the judge to conclude that the affidavit and testimony "do not show 'actual innocence.'"

The court first took note of the contradiction between Brown's and Rodgers' physical descriptions of the shooter. See *supra* note 8. The court then catalogued the internal inconsistencies between Brown's affidavit and hearing testimony. The court noted that Brown's affidavit states that the shooting occurred "sometime between 10 a.m. and 12 p.m.[,]" but testified at the hearing that the shooting occurred at night. The court also characterized Brown's affidavit as stating that he "wanted to stop at the [c]arryout," a (purported) statement that conflicted with Brown's hearing testimony that he "didn't intend to stop" at the carryout, but instead, "was intending to keep moving." The court next cited Brown's affidavit statement that he saw Half shoot at a group of males exiting the carryout, which

the judge contrasted with Brown's hearing testimony about shots fired at "three males and one girl" coming out of the carryout.[21] The court also noted that Brown stated in his affidavit that he saw Half walk over to Washington after the initial shots and fire multiple rounds into his body, but (as described by the judge) testified at the hearing that "after the initial shots, . . . everyone, including [Half], fled the scene."[22] Finally, the court cited Brown's affidavit statement that "[l]ater in my life I met Joel Caston[,]" a statement the court contrasted to Brown's hearing testimony that (as the court put it) he "had never met [appellant]." The court found that Brown's inconsistent and contradicted accounts "fail[ed] to turn the heavy weight of evidence produced at trial in favor of [appellant's] innocence."

The court found that appellant's hearing testimony was "significantly inconsistent with that of his proffered witnesses and grossly undermine[d] the

---

[21]    At trial, Thompson testified that when Washington, Gene and Mark exited the carryout, there were two other people whom he did not know near the front door of the carryout.

[22]    Actually, Brown testified that after the man who had been shot fell to the ground, Brown "ducked behind the car" and did not "see anything further that Half did while the person was on the ground"; and that "[e]verybody just like start running and the people was trying to help . . . the man but once I seen Half on my way I ran the opposite way." Brown's testimony does suggest *both* that *everybody* ran *and* that some people stayed to help the fallen man; the testimony possibly meant that the gunshots caused everyone to run for cover briefly but that some people then came to assist the victim.

credibility of their affidavits and hearing testimony."[23] The court stated in addition that appellant's "self-serving" testimony "does not sway the [c]ourt towards finding [appellant] or any of his 'newly found witnesses' credible."[24]

## V. Appellant's Arguments

Appellant raises a number of challenges to the court's ruling. He does not challenge the court's conclusion as to the Rodgers affidavit. As to Uzzle, however, appellant argues that the court erred in concluding that her evidence was not "new" and that it was "merely impeaching and not credible." He also argues that the court's rejection of Brown's testimony "solely because of unsupported or

---

[23] The Order referred to inconsistencies between appellant's testimony and that of his proffered "witnesses" (plural), but specifically discussed only inconsistencies between appellant's and Uzzle's accounts.

[24] The court did not discuss whether appellant's testimony was new evidence, but acted well within its discretion in determining not to rely on appellant's testimony as a basis for relief. Appellant testified during the IPA hearing that he did not testify at his trial on advice of counsel. Thus, he made a strategic decision not to testify, thereby "deliberately withh[olding,] . . . for purposes of strategic advantage[,]" D.C. Code § 22-4135 (d)(1), his exculpatory account that he was never in the closet with the alleged murder weapon that police recovered, and that Half was in the back bedroom where the gun was found. Even if appellant's account at the IPA hearing was truthful, "his deliberate strategy of withholding from the jury a truthful account" amounted to deliberate withholding under § 22-4135(d)(1), and thus his account does not constitute "new evidence" that can satisfy the prerequisite for relief under the statute. *Bouknight*, 867 A.2d at 254.

insignificant inconsistencies between his affidavit and testimony, [was] clear error." He further contends that the court erroneously failed to consider how appellant's testimony demonstrates actual innocence and erred in rejecting it on the ground that it was "inconsistent with Uzzle's testimony about insignificant events prior and subsequent to the murder." In addition, appellant argues that the court "erroneously assumed that the evidence at trial was 'heavy.'" Finally, appellant argues that the court "erroneously required each piece of [appellant's] evidence to alone prove his actual innocence without regard to other evidence in the case[.]" More specifically, appellant argues that when the sworn accounts from appellant's proffered witnesses are taken together, they have "more credibility than the trial court took into account," and appellant's claim of actual innocence is strengthened. For the reasons discussed below, we conclude that some, but not all, of appellant's arguments have traction.

## VI. Analysis

A. *Appellant's diligence with respect to Uzzle and the court's ruling that Uzzle's evidence was not credible*

As described above, Uzzle's trial testimony was to the effect that she had first-hand knowledge about the murder scene and aftermath, and appellant

confirmed at the IPA hearing that he did not try to contact Uzzle or ask anyone else to contact her at any time during the trial. Our case law "hold[s] individuals asserting their right to relief on the basis of new evidence to a high standard of diligence in discovering that evidence." *Richardson*, 8 A.3d at 1249. The factual record and our case law fully support the court's conclusion that appellant did not exercise the requisite due diligence with respect to Uzzle. We held in *Richardson* that where it "came to light on the first day of trial" that a witness had relevant information about facts surrounding the charged crime, the "exercise of due diligence should have caused appellant to attempt to speak with [the witness] immediately upon learning of her connection[.]" *Id.* at 1249. The fact that Uzzle's trial testimony did not reveal that she might know who the shooter was, is "a lame excuse for appellant's failure to make any effort to contact" her, *id.* at 1250, where she professed to have been on the scene in the immediate aftermath of the shooting (when Half was going through Washington's pockets),[25] and where appellant's trial counsel actually pursued a line of questioning about whether Half "was upset with [Washington]" before the shooting. Especially given our deferential and narrow standard of review on the question whether appellant has been diligent in

---

[25] As already described, Uzzle testified at trial that when she saw Washington's body on the ground a couple of minutes after she heard shots, Gene, Mark, Thompson, and Half were all on the scene.

proffering "new evidence," we can find no erroneous exercise of discretion in the court's conclusion regarding appellant's efforts with respect to Uzzle.[26]

We also defer to the court's determination about the credibility of Uzzle's hearing testimony, because "witness recantations in general are properly viewed with great suspicion." *Turner v. United States*, 116 A.3d 894, 927 (D.C. 2015) (internal quotation marks omitted); *see also Johnson v. United States*, 33 A.3d 361, 371 (D.C. 2011) ("Recanting affidavits and witnesses are looked upon with the utmost suspicion[,]" and the trial court acts within its authority in rejecting a recantation as not credible (internal quotation marks omitted)). We are satisfied that the court reasonably found that Uzzle's hearing-testimony recantation (e.g., of her grand jury testimony that she did not know who shot Washington, and that Half said nothing to Washington when Half and Uzzle saw Washington before the shooting) was not credible. Although Uzzle claimed that she did not testify about

---

[26] Appellant did not establish at the IPA hearing that Uzzle would have withheld the exculpatory evidence in a pre- or mid-trial interview with the defense or that she would have refused to talk with the defense altogether. And while appellant could have asked Uzzle about those matters at the IPA hearing, he did not. This record leaves us with some doubts about the court's seemingly speculative conclusion that it would have taken "minimal effort" for appellant to "obtain [from Uzzle] th[e] favorable testimony she now purports to offer[.]" However, in light of our conclusion that appellant failed to meet the IPA diligence standard with respect to Uzzle's testimony, as well as the deference we accord to the court's determination that Uzzle's hearing testimony was not credible, we need not decide whether the court had an adequate basis for that conclusion.

Half's role previously because she did not want to go to jail for having shared in what Half plundered from Washington's pockets, she gave no reason why — when Half was already dead — she could not have testified about Half's putative confession and his motive for taking revenge against Washington without implicating herself.[27] As the court put it, Uzzle gave no satisfactory explanation for her omission of "critically significant facts" at trial.[28]

Appellant contends, however, that the court should not have dismissed Uzzle's hearing-testimony account by viewing it "in isolation." We agree that it is not proper for a court evaluating a claim of actual innocence to evaluate each piece

---

[27] Moreover, as described above, Uzzle actually admitted at trial to having participated with Half in stealing Washington's money.

[28] Appellant relies on *People v. Deacon*, 946 N.Y.S.2d 613 (N.Y. App. Div. 2012), in which the court stated that "[w]hile recantation evidence is considered to be the most unreliable form of evidence, its credibility may be established if certain factors are present, including its inherent believability, the demeanor of the recanting witness, the existence of corroborating evidence, the reasons offered for the recantation of the previous testimony, the relationship between the recanting witness and the defendant, and the importance of facts established at trial as reaffirmed in the recantation." *Id.* at 618 (citation and internal quotation marks omitted). In explaining in that case why the witness's recantation had an "aura of believability," the *Deacon* court emphasized that "there appear[ed] to be no relationship between [the recanting witness] and the defendant of a nature that would motivate [the witness] to inappropriately come to the defendant's aid." *Id.* Here, by contrast, Uzzle had known appellant all his life and regarded him as a son or nephew.

of evidence in isolation in a manner that (as appellant puts it) "require[s] each piece of evidence to alone prove [the defendant's] actual innocence without regard to other evidence in the case[.]" But appellant's argument goes further. He contends that when Uzzle's testimony about Half's motive, appellant's testimony that Half was in the room with the murder weapon, and Brown's testimony that he saw Half shoot Washington, are taken together, Uzzle's motive evidence has "far more credibility than the trial court took into account." An appropriate generic response to this argument is perhaps that an accumulation of multiple witnesses' discredited testimony has no more strength than a single witness's discredited testimony (because, as one court put it in mathematical terms to make a similar point, "any number multiplied by zero is still zero"[29]). Just as a defendant cannot rely on properly discredited testimony to bolster the reliability of other evidence he has put forward, he cannot rely on that other evidence to bolster properly discredited testimony.

---

[29] *Gudino v. Allison*, No. 1:10-CV-01310-AWI, 2013 WL 1281620, at *18 (E.D. Cal. Mar. 27, 2013); *see also Stephenson v. Connecticut*, 639 F. App'x 742, 745 (2d Cir. Feb. 24, 2016) (letter from witness retracting certain portions of his trial testimony "must first be found credible for it to be relevant to the question whether or not, in concert with the other evidence . . . , it presents a compelling case of innocence").

More to the point in the present context, this court has held that "[w]hen a convicted person moves for a new trial under [the IPA] by submitting [evidence] of a government witness purporting to recant h[er] trial testimony, . . . if the judge reasonably finds the recantation to be not credible, that determination properly '*ends the inquiry*[.]'" *Bell v. United States*, 871 A.2d 1199, 1201-02 (D.C. 2005) (emphasis added); *see also Turner*, 116 A.3d at 927 n.94, 928-29 (D.C. 2015) (discussing the recantations by four witnesses and holding that "[w]ithout the discredited recantations, appellants' remaining new evidence was clearly not enough to overcome the government's proof of their guilt and show their actual innocence by a preponderance of the evidence"). Because D.C. Code § 22-4135 (g)(1) expressly gives the trial court authority to "consider any relevant evidence" in determining whether to grant relief, the court had discretion to compare the content of the discredited accounts for purposes of its analysis.[30] But as the analysis in *Turner* establishes, in connection with an IPA motion, a mere accumulation of (consistent but) discredited testimony does not make it more likely than not that any of the discredited testimony is true. *Turner*, 116 A.3d at 929.

---

[30] Thus, contrary to appellant's argument, the court did not err in examining appellant's testimony for its consistency *vel non* with Uzzle's testimony.

B. *The ruling that Brown's evidence was merely "impeaching"*

We cannot agree with the court's conclusion that Brown's testimony was no more than "mere impeachment evidence." It is true that Brown's testimony that Half was the shooter impeached Thompson's trial testimony that appellant was the shooter. But, if believed, Brown's testimony that he saw Half shoot Washington was also directly and completely exculpatory as to appellant — establishing that he "did not commit the crime of which he . . . was convicted," D.C. Code § 22-4131 (1).

While the IPA does not define the term "impeaching," implicit in our IPA case law is an understanding that evidence is merely "impeaching" for IPA purposes when, if credited, it does not establish that the appellant is actually innocent. For example, in *Richardson*, we noted that testimony (by one Croskey) proffered as "new evidence" "[a]t most . . . might have been used to impeach" the identification offered by a trial witness, and was "not proof of [Richardson's] actual innocence," because "Croskey definitively testified that she did not see the shooter, and she did not and could not say that appellant was not the shooter[.]" 8 A.3d at 1250. Our case law under Rule 33 is to the same effect. *See Prophet v. United States*, 707 A.2d 775, 778 (D.C. 1998) (rejecting the conclusion reached by

the trial court, namely, that the affidavit from appellant's co-defendant, in which the co-defendant assumed the entire blame, was "no more than impeaching evidence," reasoning that the "affidavit proffered substantive evidence and did not merely attack the general credibility of" the government's trial witness). Other courts have similarly recognized a "pivotally important" distinction between "impeaching" (but also exculpatory) and other impeaching evidence. *See, e.g.*, *State v. Hunt*, 116 A.3d 477, 489 (Md. 2015) (explaining that a petitioner for a writ of actual innocence must do more than present "[n]ewly discovered evidence that a State's witness had a number of convictions" implicating her "truth and veracity," or evidence that the State's witness gave "deliberately false" testimony "about inconsequential details that did [not] go to the core question of guilt or innocence"; the petitioner must present "directly exculpatory evidence on the merits").[31]

---

[31] *See also United States v. Quiles*, 618 F.3d 383, 395 (3d Cir. 2010) (Evidence is not "merely impeaching" if "there is a strong exculpatory connection between the newly discovered impeachment evidence and the charge against the defendant"); *Ward v. State*, 108 A.3d 507, 520 (Md. Ct. Spec. App. 2015) ("[E]vidence attacking the merits of inculpatory testimony should not be dismissed as 'merely impeaching,' even if it happens to be 'coincidentally impeaching.'"); *Love v. State*, 621 A.2d 910, 917 (Md. Ct. Spec. App. 1993) ("[T]he most critical exculpatory evidence always is 'impeaching' of the State's case . . . not 'merely impeaching.'").

Here, Brown's testimony, if true, meant that appellant could not have been the shooter. It was error to reject it as "mere impeachment evidence."[32]

C. *The significance of inconsistencies*

The court correctly observed that Brown's hearing testimony differed in several respects from certain statements in his affidavit. In assessing Brown's credibility, the court was certainly entitled to take into account internal inconsistencies.[33] However, at least one purported inconsistency reflects the court's own loose paraphrasing of Brown's testimony.[34] Also, because the record

---

[32] The court made the same error in rejecting, as "at best" impeachment evidence, Uzzle's hearing testimony that Half had a motive to kill Washington and later confessed to the murder.

[33] A witness's "story itself may be so internally inconsistent . . . that a reasonable factfinder would not credit it." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).

[34] To wit, as described above, the court characterized Brown's affidavit as stating that he "wanted to stop by the [c]arryout," a (purported) statement that conflicted with Brown's hearing testimony that he "didn't intend to stop" at the carryout and, instead, "was intending to keep moving." Actually, Brown's affidavit states that "on my way home I stopped at the carryout. When I made it to the carryout parking lot, I saw Haf coming from the phone booth that was located in the parking lot going toward the carryout's front door. . . . Before it [presumably, "he" or "I"] could reach the carryout Haf fired a [sic] multiple shots at a group of males who were coming out of the carryout's front door."

makes clear that someone other than Brown typed his affidavit and that Brown's attention to language and detail was wanting,[35] the record compelled a nuanced analysis of the inconsistencies. In addition, we are concerned that the court's assessment as to Brown may have been tainted by a failure to appreciate that Brown's evidence was not merely impeaching. We also want to be sure that the force of Brown's exculpatory testimony is not discounted solely on the basis of inconsistencies that are minor, or that pertain to inconsequential matters, or that are (or might have been, upon follow-up inquiry) explainable.

Courts are in general agreement that the significance of inconsistencies between a witness's pre-hearing and hearing statements is a determination of law,

---

[35] Brown, who did not finish high school, and who explained that his "cursory [sic] writing ain't so good," testified that he neither read the affidavit with care (we note that he did not correct the "Before *it* could reach the carryout" or the "a multiple shots" mentioned *supra* in note 34) nor executed it with care (as he testified, in his signature he "ain't finish the last E" in his given name, "Jermaine," signing it "Jermain" instead). His hearing testimony also demonstrated that his use of language is far from precise. Appellant's brief cites, as one example of this, Brown's testimony that after the shooting, a young lady cried out, and "everything went AWOL." For those reasons, even if (to give just one example) all Brown meant to say in his affidavit regarding when he first became familiar with appellant's case was that he learned of appellant when he saw a photo of appellant and spoke with appellant's sister in 2009, it does not seem implausible that he would nonetheless have signed a statement that says "[l]ater in my life I met Joel Caston." Similarly, it is not difficult to believe that Brown would not have paused over immaterial errors in the affidavit.

subject to appellate scrutiny.[36] Courts also agree that the circumstances in which inconsistent statements were made, and the declarants' explanations for the inconsistencies, must be taken into account.[37] "[M]inor inconsistencies and

---

[36] *See, e.g.*, *Kadia v. Gonzales*, 501 F.3d 817, 822 (7th Cir. 2007) ("Some of the inconsistencies [between the petitioner's testimony at the immigration hearing and the written statement that he had submitted earlier in support of his application for asylum] . . . are trivial — the sort of innocent mistake that a person testifying about events that had occurred years earlier would be likely to make"); *Latifi v. Gonzales*, 430 F.3d 103, 105 (2d Cir. 2005) (finding error in immigration judge's adverse credibility determination premised on asylum applicant's "essentially telling three different stories [in his airport interview, credible fear interview, and hearing testimony]," because the discrepancies in the applicant's account were "far from 'significant and numerous,' but rather insignificant and trivial"); *State v. Wilcox*, 758 A.2d 824, 834 (Conn. 2000) (holding that where "[e]ssentially, the differences between the victim's trial testimony and what she had told [the victim's advocate] were: (1) that she had entered the defendant's vehicle while walking down the driveway of the bar rather than in the parking lot; and (2) that she had planned on walking home from the bar, although she told [the victim's advocate] that she had asked Lawrence whether the defendant was a person from whom it would be OK to accept a ride," "the victim's statements [as memorialized by the victim's advocate] did not substantially differ from her testimony at trial"). As is reflected in two of the foregoing citations and those in the immediately following footnotes, issues about the significance of inconsistencies between a witness's pre-hearing and hearing statements seem to have arisen most often in the asylum-application context, where courts have focused on discrepancies between the written applications or interview statements of immigrants seeking asylum, and those individuals' later sworn testimony at asylum hearings.

[37] *See, e.g.*, *Kai Ting Huang v. Gonzales*, 143 F. App'x 502, 504 (3d Cir. 2005) ("We are cautious in our reliance on airport interviews, and standing alone, inconsistencies between statements at such an interview and at later proceedings will not support an adverse credibility determination."); *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 518 (E.D. Cal. 2014) (holding, in case involving alleged violations of state wage and hour provisions, that "considering the nature and circumstances in which [employees'] statements were made and recorded . . .

(continued…)

omissions will not support an adverse credibility determination." *Zhang v. Holder*,

737 F.3d 501, 504 (8th Cir. 2013) (internal quotation marks omitted).[38]

---

(…continued)

the [c]ourt cannot find they reflect significant inconsistencies"); *see also Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) ("[W]ithout some attempt by the ALJ to explore the supposed contradictions here, they do not provide a sound basis for concluding that Ms. Beardsley's report was inaccurate." (internal quotation marks and alterations omitted)); *Halajanyan v. Holder*, 380 F. App'x 636, 637, 638 (9th Cir. 2010) (reasoning that "[t]o the extent that Halajanyan's testimony about whether she was in Armenia or Russia in 1999 conflicts with her son's asylum application, she was never given an opportunity to explain the discrepancy"; and holding that "unclear testimony may not serve as substantial evidence for an adverse credibility finding when an applicant is not given the chance to attempt to clarify his or her testimony").

[38] *See also Yaogang Ren v. Holder*, 648 F.3d 1079, 1084-85 (9th Cir. 2011) (holding that even after a 2005 change in federal law that expressly permits immigration judges to consider "any inaccuracies or falsehoods in [an asylum applicant's] statements, without regard to whether [an inconsistency, inaccuracy, or falsehood] go[es] to the heart of the applicant's claim," immigration judges "remain obligated to provide specific and cogent reasons supporting an adverse credibility determination[,]" reasons which "must consist of something more than trivial inconsistencies that under the total circumstances have no bearing on a petitioner's veracity"; and that judges "should recognize that the normal limits of human understanding and memory may make some inconsistencies or lack of recall present in any witness's case.") (internal quotation marks, citations, and alterations omitted); *accord*, *Chun Sui Yuan v. Lynch*, No. 15-2834, 2016 WL 3536667, *4, 7 (7th Cir. June 28, 2016) (explaining that the Board of Immigration Appeals and immigration judges "still must distinguish between inconsistencies that are material and those that are trivial" and that "reasonable explanations for discrepancies must be considered"; and concluding that "the purported inconsistencies regarding Yuan's injuries and time in the hospital, his method of transportation to the hospital, and whether or not government officials questioned him at his workplace are either so easily explained or so trivial as to call into doubt the Board's decision"); *Mamane v. Lynch*, 637 F. App'x 874, 884 (6th Cir. 2016) ("[I]nconsistencies or inaccuracies must always be considered in light of the

(continued…)

The court did not address (and did not consider explicitly) whether the inconsistencies between Brown's affidavit and hearing testimony that the court described were significant.  We will not substitute our own judgment about the significance *vel non* of the inconsistencies, for the court's initial determination.  That said, it does seem to us that at least some of the inconsistencies the court highlighted pertain to seemingly unimportant facts and should not weigh heavily (if at all) toward an adverse credibility determination.  That observation applies most obviously to the inconsistency cited first in the court's ruling:  Brown's

---

(…continued)

'totality of the circumstances.'"); *Jin v. Holder*, 439 F. App'x 591, 592 (9th Cir. 2011) (favorably citing the principle that "a minor inconsistency in identifying the location of a person's persecution will not support an adverse credibility determination"); *Zheng v. Holder*, 530 F. App'x 87, 88 (2d Cir. 2013) ("These one- and two-day inconsistencies [about when certain events occurred], which Zheng promptly corrected, in testimony given more than a year and one half after the events, are too trivial to lend support to a finding that Zheng lacked credibility."); *Halajanyan*, 380 F. App'x at 637, 638 (stating that "minor inconsistencies in the record, such as the date of Halajanyan's son's arrest and the relative timing of the search of her home . . . which cannot be viewed as attempts to enhance Halajanyan's claims of persecution, are too insignificant to support an adverse finding regarding Halajanyan's credibility generally"); *cf. Walsh v. District of Columbia Police & Firefighters Retirement & Relief Bd.*, 523 A.2d 562, 566 (D.C. 1987) (noting that the Board cited inconsistencies in the claimant's testimony as a basis for an adverse credibility determination and concluding that "the testimonial evidence relied on here to make this determination does not rise to the level of substantial evidence, even if the purported inconsistencies are assumed to exist"); Criminal Jury Instructions for the District of Columbia No. 2.200 ("Credibility of Witnesses") (instruction, with respect to inconsistencies or discrepancies in the testimony of a witness, that "[i]n weighing the effect of the inconsistency or discrepancy, always consider whether it pertains to a matter of important or unimportant detail").

hearing testimony that the shooting occurred at night, versus his affidavit statement that the shooting occurred between 10 a.m. and 12 p.m. The court did not consider (or at least did not consider explicitly) whether this inconsistency might reflect the "common mistake" of transposing "a.m." for "p.m.,"[39] or vice versa, or reflect confusion about whether midnight is 12 p.m. or 12 a.m. The court also did not address Brown's explanation at the hearing that he "did not look at . . . the a.m. part" when reviewing the affidavit. *Cf. Stephenson*, 639 F. App'x at 745-46 (remanding actual innocence claim to the trial court where that court failed to address witness's explanation for the inconsistency between his trial testimony and the statements he made in a letter to the court submitted after the defendant's conviction).

The inconsistency between Brown's affidavit statement about shots fired toward a group of males exiting the carryout and his hearing testimony that the group might "probably" have included "one girl" also strikes us as relatively

---

[39] *Cf. Hadley v. Journal Broad. Grp., Inc.*, No. 11-C-147, 2012 WL 523752, *2 (E.D. Wis. Feb. 16, 2012) (noting that plaintiff "had accidentally entered "a.m." instead of "p.m." on two separate occasions"); *United States v. Wilkerson*, 3:10CR75-WHA, 2010 WL 4624046, *1 (M.D. Ala. Aug. 18. 2010) (describing defendant's contention that "the search warrant return and inventory incorrectly state that the return was made at 2:17 a.m. rather than 2:17 p.m."); *1199 Hous. Corp. v. Griffin*, 520 N.Y.S.2d 93, 94 (N.Y. Civ. Ct. 1987) ("The second process server also twice seems to have reversed the use of a.m. and p.m.").

unimportant. We note that Brown's hearing testimony about a young lady crying out after shots were fired seems consistent with his testimony that the individuals who were in front of the carryout at the time of the shooting included "one girl as well as three men." We further observe that, without having credited the description of the shooter given by Rodgers in his affidavit, the court had no basis for discrediting Brown's conflicting description. To be sure, where the proffered support for a claim of actual innocence consists solely of affidavits that give inconsistent accounts about the crime, a court may conclude that the movant has not met his burden.[40] But here, Brown (who, unlike Rodgers, claimed to know Half) not only signed an affidavit, but also appeared for the IPA hearing. At the hearing, no one asked Brown about his description of Half (and, similarly, no one asked Uzzle to describe Half). In these circumstances, the inconsistency between Brown's and Rodgers' descriptions of the shooter did not provide an adequate basis for concluding that Brown's exculpatory testimony was not credible.[41]

---

[40] *Cf. Herrera v. Collins*, 506 U.S. 390, 418 (1993) (reasoning that because the affidavits of the petitioners' witnesses filed in a habeas proceeding contained inconsistent accounts about petitioner's whereabouts on the night of the killings, about the direction in which the claimed murderer's vehicle was heading when the murders took place, and about the number of people in the vehicle, the affidavits "therefore fail[ed] to provide a convincing account of what took place on the night [the victims] were killed").

[41] "[C]redibility determinations cannot be based on affidavits[.]" *Bellinger v. United States*, 127 A.3d 505, 515 (D.C. 2015) (quoting *Newman v. United*

(continued…)

It cannot be gainsaid that the ultimate responsibility to determine Brown's credibility and whether appellant is more likely than not actually innocent lies with the Superior Court judge, and that the Superior Court judge's factual findings "anchored in credibility assessments derived from personal observations of the witnesses [are] beyond appellate reversal unless those factual findings are clearly erroneous.'" *Hill v. United States*, 664 A.2d 347, 353 n.10 (D.C. 1995). Notably, however, in this case the court did not find Brown generally incredible; the court found no reason to reject Brown's testimony that, for years, he never returned to the neighborhood after the shooting and had no contact with anyone connected to the case. The court also did not cite Brown's demeanor as a reason for discrediting his account of the shooting. Thus, we are not confronted here with a credibility determination that was "based on factors that [could] only be ascertained after observing the witness testify." *David v. United States*, 957 A.2d 4, 8 (D.C. 2008) (internal quotation marks omitted). In addition, it is clear that "[d]espite the inconsistencies and credibility flaws" of a proffered witness, the witness's

---

(…continued)
*States*, 705 A.2d 246, 261 (D.C. 1997)); *see also Thomas v. United States,* 942 A.2d 1180, 1185 (D.C. 2008) ("[A]n evidentiary hearing was necessary to assess Ms. Dobbins's credibility, particularly because she had not testified at trial."). An IPA-motion judge may be able to "assess the credibility of [an] affidavit" if the judge heard testimony from the affiant at trial, *see Bell*, 871 A.2d at 1201, but that emphatically was not the case here. Judge Jackson did not preside at appellant's trial, Rodgers did not testify at trial, and there was no trial testimony about Half's physical characteristics.

testimony can still have "substantial exculpatory potential[.]" *Rollerson v. United States*, 127 A.3d 1220, 1228 (D.C. 2015).

D. *The "heavy" weight of the evidence produced at trial*

The court found that Brown's testimony "fail[ed] to turn the heavy weight of evidence produced at trial in favor of [appellant's] innocence." However, Judge Jackson did not preside over appellant's trial, and we thus are constrained to observe that his assessment of the weight of the trial evidence can be no better than our own.[42] We think it was incumbent on the court to at least consider the potential weaknesses in the government's case that appellant cited in his IPA papers. As appellant highlights, Thompson, the sole eyewitness to the shooting who testified at trial, had pled guilty and been convicted of murder at the time of appellant's trial, but had not yet been sentenced, and hoped for a favorable recommendation from the government in exchange for his inculpatory testimony

---

[42] Judge Jackson acknowledged during the proceeding in which he decided to schedule an IPA hearing that because he was not the trial judge, he did not "have the same perspective of the witnesses [and] the evidence . . . that the trial judge would have, even after so many years have passed since the original trial."

against appellant.[43] With reference to the firearms examiner's testimony at trial that bullet fragments recovered from Washington's body and from the crime scene "were in fact fired through the barrel of th[e] .44 Magnum revolver" that police found in the closet where appellant was hiding, appellant also cited in his IPA motion papers the "considerable change to the level of confidence given firearm and toolmark identification evidence," a change this court has recently recognized. *See Gardner v. United States*, 140 A.3d 1172, ____ (D.C. 2016) (citing a National Research Council report stating that "[t]he validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated," and holding that "in this jurisdiction a firearms and toolmark expert may not give an unqualified opinion, or testify with absolute or 100% certainty, that based on ballistics pattern comparison matching a fatal shot was fired from one firearm, to the exclusion of all other firearms"). The court's ruling did not address these matters.

---

[43] Also, Thompson initially testified at trial that he knew appellant from having worked with him "a while ago" during a summer job and saw appellant "[o]ff and on," but was impeached with his grand jury testimony that he knew appellant because he had seen him "around" about a week before the shooting. The court had no basis for assessing the credibility of Thompson's trial testimony.

E. *Appellant's testimony and its effect*

We discern no basis for disturbing the court's ruling that appellant's "self-serving" testimony was not credible, especially because it "contradict[ed] the less than favorable aspects of the testimony of his proffered witness" Uzzle. As noted above, however, the judge also found that appellant's hearing testimony "grossly undermine[d] the credibility of the[] affidavits and hearing testimony" of "his proffered witnesses." In light of that statement, it appears to us that "[t]he judge's evaluation of [appellant's] credibility remained . . . a matter that informed the judge's rulings on the matters upon which the IPA required him to rule." *Bouknight*, 867 A.2d at 258.[44] We have concern, as we did in *Bouknight*, that the court's "assessment of [appellant's] testimony as incredible" was a "separate ground for denial of [appellant's] motion," *id.* at 257, i.e., that the judge's evaluation of the statutory factors he was required to consider, "in particular, his consideration of how and whether the proffered 'new evidence [(Brown's testimony)] demonstrates actual innocence' . . . depended upon the judge's

---

[44] Appellant asserts in his Reply Brief that "[t]his is not a case like *Bouknight* in which the trial's court's 'emphatic credibility ruling' . . . [about] the defendant's 'repeated lies'" was a compelling factor in denial of the IPA motion. Appellant may be correct that the court's view that appellant's hearing testimony "grossly undermine[d] the credibility of the[] affidavits and hearing testimony" of his proffered witnesses, was not the most critical factor in the court's denial of the IPA motion, but it does appear to have played a role.

assessment of [appellant's] credibility." *Id.* at 257-58. To the extent that the lack of credence the court placed in appellant's hearing testimony tainted Brown's exculpatory "new evidence" and rendered the judge "unable to come to the conclusion that it is more likely than not that [appellant] is actually innocent of the crime[,]" *id.* at 258 (internal quotation marks omitted), the judge's credibility assessment as to appellant improperly "gutted the core of [appellant's] IPA motion," giving appellant "no chance of prevailing upon consideration of all the factors the IPA says must be considered." *Id.*

\*\*\*

For all the foregoing reasons, we conclude that a remand is in order for the court to consider the significance *vel non* of the inconsistencies between Brown's affidavit statements and hearing testimony;[45] to consider the force of Brown's exculpatory (and not-merely-impeaching) testimony in light of asserted weaknesses in the government case at trial and the evidence as a whole; and to

---

[45] *Cf. Zheng*, 530 F. App'x at 88-89 ("In view of the fact that the other inconsistencies noted by the [immigration judge] are at best of only marginal significance, we conclude that a remand is warranted for reconsideration of Zheng's credibility, without regard to the two items concerning the October dates.").

assess the credibility of Brown's testimony unaffected by the court's assessment of appellant's credibility. Accordingly, the trial court's order is hereby vacated and the matter remanded for further proceedings consistent with this opinion.

*So ordered.*