*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 19-CO-0076

BARRY D. STRINGER, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2005-FEL-004970)

(Hon. Julie H. Becker, Trial Judge)

(Argued May 8, 2023                    Decided September 19, 2023)

*Gregory M. Lipper* for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *Chrisellen R. Kolb*, *John P. Mannarino*, *Nihar R. Mohanty*, and *Caroline R. Burrell*, Assistant United States Attorneys, were on the brief, for appellee.

Before DEAHL, HOWARD, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: This post-conviction matter arises out of the murder of Tilford Johnson in 2003.  Appellant Barry D. Stringer and his nephew Roderick Charles were charged with the murder and related offenses and went to trial separately.  They both were convicted in 2006 of first-degree felony murder

while armed, second-degree murder while armed (as a lesser-included offense of first-degree premeditated murder while armed), armed robbery, and three counts of unlawful possession of a firearm during a crime of violence or dangerous offense. This court affirmed Mr. Stringer's and Mr. Charles's convictions but remanded in both cases for resentencing on merged offenses. Mr. Charles was resentenced in October 2014 to 372 months in prison; Mr. Stringer was resentenced in January 2021 to 432 months in prison.

In 2014, based on new evidence, Mr. Stringer moved, pursuant to the Innocence Protection Act (IPA), D.C. Code § 22-4131 et seq., to vacate his convictions and dismiss the charges or for a new trial. The new evidence consisted of an affidavit by Mr. Charles in which he claimed that he acted alone in killing Mr. Johnson and that Mr. Stringer was not involved. After holding an evidentiary hearing at which Mr. Charles testified, the trial court denied the motion on the ground that Mr. Charles was not credible. Mr. Stringer appealed.

Respectful of the substantial deference due to the trial court on credibility determinations and on the ultimate issue of actual innocence under the IPA, but uncertain about the bases for some of the court's findings and conclusions, we remand the matter to the trial court for reconsideration in light of this opinion.

## I.    Background

### A.

Tilford Johnson was murdered in the early morning hours of June 3, 2003. His body was found later that morning in a car parked in an alley behind 28th Street, SE, in Washington, D.C.  When Metropolitan Police Department ("MPD") officers arrived at the scene, they discovered Mr. Johnson's body slumped in the driver's seat, with a single gunshot wound to the head.  The doors to the car were locked, the windows were up, the key was in the ignition, and the parking brake was engaged. The rear driver's side window of the car was shattered.  Mr. Johnson's wallet was in the car, empty.  Police found a "vast" amount of blood on the rear seat and floor behind the driver's seat.  Blood was also on the outside of the car, and a trail of blood led away from the car to a property bordering the alley on Buena Vista Terrace, SE.

### B.

Mr. Stringer and Mr. Charles, his nephew, were charged with Mr. Johnson's murder and related offenses.  They went to trial separately in 2006.

The evidence against Mr. Stringer essentially consisted of evidence implicating Mr. Charles (who had already been convicted but not sentenced); phone records showing numerous contacts between Mr. Charles and a phone associated with Mr. Stringer close in time to the murder; testimony by Mr. Stringer's brother (and Mr. Charles's uncle) inculpating both Mr. Charles and Mr. Stringer; and a letter

Mr. Stringer sent to Mr. Charles while both were incarcerated. *See Barry Stringer v. United States*, No. 06-CF-1515, Mem. Op. & J. (D.C. July 20, 2009).

The evidence was as follows. Mr. Johnson and his roommate, Anthony Collins, were both friends with Mr. Charles. When Mr. Collins learned that Mr. Johnson had been murdered, he called Mr. Charles. Mr. Charles said that Mr. Johnson had called him on the night of June 2, 2003, to ask if Mr. Charles would accompany him on a drive to Boston. Phone records showed that Mr. Johnson called Mr. Charles 12 times between 11:38 p.m. on June 2, 2003, and 2:58 a.m. on June 3, 2003, with the 2:58 a.m. call being the last call on Mr. Johnson's phone.

Between 3:25 a.m. and 3:28 a.m., Mr. Charles made several calls to the residence of his friend James Campbell, who lived with his brother Jermaine and others. When Jermaine answered the last call, he told Mr. Charles that he was sleeping and hung up. The Campbell brothers lived at 3208 28th Street, SE—about 150 feet from where Mr. Johnson's body was found.

Immediately after the last call between Mr. Charles and Mr. Johnson, Mr. Charles called the phone number 202-xxx-9730. The subscriber of that cell phone account, Tiffany Thompson, testified in the grand jury (by adopting statements she had given to investigators) that she bought the cell phone in late 2002 when she went to the store with Mr. Stringer and Carlos Sly, her son's father and Mr. Stringer's friend. Mr. Sly had asked her to get a cell phone for Mr. Stringer.

Ms. Thompson knew that the phone was for Mr. Stringer and that Mr. Stringer used the phone, although Mr. Sly paid the monthly bills. At trial, Ms. Thompson testified inconsistently with her grand jury testimony, saying that Mr. Sly had asked her to purchase the phone for his own use. She was impeached with her grand jury testimony.

Cell phone records showed that between 11:00 p.m. on June 2 and 3:00 a.m. on June 3, Mr. Charles and the individual with the -9730 phone called each other approximately 14 times. There were several more calls between the two between 3:00 a.m. and 3:17 a.m., and then nine calls starting at 9:22 a.m. on June 3. The last of those calls was from the -9730 phone at 10:59 a.m. on June 4, 2003. Minutes thereafter, someone who identified himself/herself as the subscriber for Mr. Charles's number called the cell phone company and requested that the company change the cell phone number. There was no further activity for Mr. Charles's telephone number after 11:13 a.m. on June 4, 2003.

Robert Lyles, Mr. Stringer's brother and Mr. Charles's uncle, testified at trial pursuant to a plea agreement in a separate narcotics case, in which he had not yet been sentenced. Mr. Lyles stated that Mr. Charles told him, a few days after Mr. Johnson's murder, that he and Mr. Stringer had robbed a person of marijuana and money in an alley and that Mr. Stringer had shot the person. Specifically, according to Mr. Lyles, Mr. Charles told him that Mr. Charles and the victim were

in a car together and drove to an alley; once there, Mr. Stringer "came up and got in the car" and then "shot the person." Mr. Lyles added that a few days after that, he saw Mr. Stringer in a car, approached the window, and struck up a conversation; Mr. Stringer asked Mr. Lyles if Mr. Lyles had heard about what had happened in the alley, and when Mr. Lyles responded that he had heard about it, Mr. Stringer stated, "That was me." Mr. Lyles acknowledged that he did not tell anyone about Mr. Charles's and Mr. Stringer's confessions for 10 months, despite the fact that he was cooperating with the government during that time, and that on four occasions he told investigators that Mr. Stringer had not talked to him about the shooting.

Police seized Mr. Charles's phone on June 27, 2003, after executing a search warrant at his home. On that same date, Ms. Thompson, the subscriber listed for the -9730 cell phone, contacted the cell phone service provider and requested termination of the service for that phone. Ms. Thompson testified before the grand jury that Mr. Stringer told her to have the cell phone service turned off, and, when she asked why, Mr. Stringer responded, "I can't tell you." At trial, Ms. Thompson testified that both Mr. Sly and Mr. Stringer told her to cancel the service, and that Mr. Stringer was relaying the message for Mr. Sly because Ms. Thompson and Mr. Sly were no longer together. Again, she was impeached with her grand jury testimony.

Law enforcement authorities also obtained a letter that Mr. Stringer wrote to Mr. Charles from jail when Mr. Stringer was incarcerated on another charge, before he was charged with Mr. Johnson's murder. In the letter, Mr. Stringer told Mr. Charles that "we fucked up," but "it won't be long before we get home[;] all you have to do is ride this shit out." Mr. Stringer told Mr. Charles "to live by the code, see nothing, know nothing, hear nothing." Attached to the letter was a copy of a confidential, internal jail document listing the inmates who were to be kept separated from Mr. Charles. Written on the document was: "These are the n----s that got a seperation [sic] on you. Rats."

In the defense case, Mr. Stringer called two individuals who testified that Mr. Charles told them that he had committed the shooting; one of them said on cross-examination that Mr. Charles said he had acted alone, although he had not said that on direct examination. Mr. Charles, who was awaiting sentencing in his own case, also testified on Mr. Stringer's behalf. He denied telling Mr. Lyles that he and Mr. Stringer robbed Mr. Johnson or that Mr. Stringer shot Mr. Johnson. Mr. Charles said he spoke to Mr. Johnson on his cell phone on the night of June 2-3, 2003, but only to give him directions. He also spoke by phone that night to Mr. Sly and Jermaine Campbell. He essentially denied involvement with the murder by stating that he was home waiting for Mr. Johnson at about 3:00 a.m. on June 3, 2003, but

Mr. Johnson never showed up.  But when asked specifically about the robbery and murder of Mr. Johnson, Mr. Charles invoked his Fifth Amendment rights.

Mr. Stringer also testified during his trial.  He denied shooting Mr. Johnson, being in the alley the night of the shooting, or having any conversations by phone or in person with Mr. Charles that night.  He denied using the cell phone purchased by Ms. Thompson, and said that it was Mr. Sly's phone, although he occasionally used it if he was with Mr. Sly.  Mr. Stringer also denied talking to Mr. Lyles about the shooting.  He admitted writing the letter to Mr. Charles and attaching a copy of the separation order, but he denied writing on the separation order.  He stated that when he wrote in the letter to Mr. Charles that "we fucked up" and that "all you have to do is ride this shit out," he meant that he and his cellmate (who was Mr. Charles's cousin) had no commissary money and they wanted Mr. Charles to send them some snacks, and that he was cautioning Mr. Charles "not to say anything about [Mr. Stringer's] legal work."  Mr. Stringer claimed that he received a copy of the separation order from his brother (and Mr. Charles's father), who was also incarcerated at the time.  In disputing this in closing argument, the government asserted that Mr. Stringer "couldn't have" gotten the document from his brother because "they were not housed in the same area of the jail."

The jury found Mr. Stringer guilty of first-degree felony murder while armed, second-degree murder while armed (as a lesser-included offense of first-degree

premeditated murder while armed), armed robbery, and three counts of unlawful possession of a firearm during a crime of violence or dangerous offense. The trial court sentenced him to 432 months in prison. This court affirmed Mr. Stringer's convictions in 2009, rejecting his challenges to the admission of Mr. Lyles's testimony, the sufficiency of the evidence, and the trial court's aiding-and-abetting jury instruction. The court remanded for resentencing on merged offenses. *Barry Stringer v. United States*, No. 06-CF-1515, Mem. Op. & J. (D.C. July 20, 2009). In January 2021, the trial court resentenced Mr. Stringer to the same aggregate term of 432 months.

## C.

Before he was resentenced and while he was incarcerated at the same facility as Mr. Stringer, Mr. Charles executed an affidavit in which he asserted that he acted alone in killing Mr. Johnson. The handwritten affidavit was dated June 19, 2014, and was witnessed by two investigators. The document was not notarized, but the trial court assumed that it was in fact signed in June 2014, and we adopt that assumption here.

In the affidavit, Mr. Charles confessed to killing Mr. Johnson on June 3, 2003. He wrote that Mr. Johnson called him and asked him to ride with him to Boston to sell drugs. Mr. Charles agreed, but before they could join up, Mr. Johnson got lost, so Mr. Charles and James Campbell went to meet him near Mr. Campbell's house.

Carlos Sly was also supposed to meet them but he was not answering his phone. Mr. Charles then decided not to wait for Mr. Sly, and, "before you know it," he pulled out his gun and shot Mr. Johnson. According to Mr. Charles, he then ran out of the alley and got into a car with Mr. Campbell and they went to Mr. Charles's house.

One of the investigators provided Mr. Charles's affidavit to Mr. Stringer's counsel around July 2014, but it does not appear that it was put before a court prior to Mr. Charles's resentencing in October 2014. In December 2014, Mr. Stringer filed a motion under the IPA, D.C. Code § 22-4131 et seq., to vacate his convictions and dismiss the charges or for a new trial based on the affidavit (and his own affidavit attesting to his innocence, *see id*. § 22-4135(d)(1)). Mr. Stringer argued that the affidavit established by clear and convincing evidence that he was innocent of the robbery and murder of Mr. Johnson.

The trial court held an evidentiary hearing at which the sole witness was Mr. Charles.[1] Mr. Charles testified that Mr. Johnson told him that Mr. Johnson had

---

[1] After his resentencing, Mr. Charles filed a motion for collateral review under D.C. Code § 23-110. Accordingly, the hearing on Mr. Stringer's IPA motion, at which Mr. Charles would testify, was stayed until Mr. Charles's Section 23-110 proceedings were completed, in 2018. And because the original trial judge had found Mr. Charles not credible in denying his Section 23-110 motion, she recused herself from considering Mr. Stringer's IPA motion and the matter was transferred to Associate Judge Julie H. Becker. By the time of the hearing, Mr. Sly, James Campbell, and the lead investigator who had witnessed Mr. Charles's affidavit had all passed away.

$13,000 and needed help finding marijuana to purchase in order to sell it in Boston. Mr. Charles wanted Mr. Sly to sell the marijuana to Mr. Johnson and called him several times before reaching him. Mr. Sly agreed to sell Mr. Johnson 20 pounds of marijuana for $13,000. Mr. Charles, James Campbell, and Mr. Johnson met around 2:00 a.m. to discuss the transaction and then the three traveled in two cars to Mr. Campbell's house. On the drive, Mr. Charles decided that he would steal Mr. Johnson's money and kill him and that he did not need Mr. Sly anymore. When they arrived at Mr. Campbell's house, Mr. Campbell went inside and Mr. Charles directed Mr. Johnson to pull into the alley. Mr. Charles then got into the front passenger seat of Mr. Johnson's car and shot Mr. Johnson in the head. Mr. Charles testified that the bullet left "just" a hole in the rear driver's-side window and that the window "was still together" and did not shatter. He said that he took the bag of money from the back seat and Mr. Johnson's phone; that the car was still running and he left the keys in the ignition; that he did not lock the car doors; and that he did not touch Mr. Johnson's wallet. He then returned to his car, which he had parked on 28th Street; he did not head toward Buena Vista Terrace. Mr. Campbell was still in his house.

In the meantime, according to Mr. Charles, Mr. Sly had called Mr. Charles a few times and "was getting impatient." Mr. Charles and Mr. Sly arranged to meet at the parking lot of a nearby carryout restaurant and exchange Mr. Sly's marijuana

for the $13,000.  Mr. Campbell had been in his apartment during the robbery and murder.  After he shot Mr. Johnson, Mr. Charles tried calling Mr. Campbell several times; Mr. Campbell eventually walked to the carryout restaurant and met up with Mr. Charles and Mr. Sly.  Once Mr. Charles had bought the marijuana with Mr. Johnson's $13,000, Mr. Charles and Mr. Campbell went to Mr. Charles's mother's house and "broke the weed down" for resale.

Mr. Charles testified that Mr. Stringer had no involvement with the murder and that he did not call Mr. Stringer that night.  He said that he was coming forward because he was young and selfish at the time of the murder and trials but, 15 years later, he was realizing that "[y]ou've got an innocent man standing over there and he didn't have anything to do with this.  Absolutely nothing."

On cross-examination, Mr. Charles acknowledged that his affidavit and testimony were inconsistent with his statements to detectives after the murder, his defense at his trial, and his testimony at Mr. Stringer's trial.  He also agreed that in his affidavit he stated that he did not reach Mr. Sly on the phone but he had testified on direct examination at the hearing that he did reach Mr. Sly after a few attempts and was able to arrange the drug transaction; Mr. Charles explained that he "just wrote it wrong" in the affidavit.  And with respect to Mr. Campbell's whereabouts, he explained that the account in his affidavit—that after the murder he ran out of the alley and "jump[ed] in the car with James and we ended up at my house"—and the

account at the hearing—that Mr. Campbell walked to the carryout restaurant and then got into his car before they went to Mr. Charles's mother's house—were "the same thing basically."

**D.**

The trial court denied Mr. Stringer's IPA motion on that ground that the court "did not find Mr. Charles to be a credible witness." Mr. Charles's testimony at the hearing was inconsistent, the court determined, with (1) the physical evidence, (2) the telephone records, and (3) Mr. Charles's testimony at Mr. Stringer's trial as well as his written affidavit. In addition to the above inconsistencies, there were "[o]ther reasons to doubt Mr. Charles's testimony."

*The Physical Evidence.* Mr. Charles's testimony that the bullet left a hole in the car window but did not shatter it, that he did not lock Mr. Johnson's car doors, that he did not touch Mr. Johnson's wallet, and that he returned to his car on 28th Street after the shooting were inconsistent with evidence from the crime scene that the window was shattered, the car doors were locked, Mr. Johnson's wallet was empty, and a blood trail went from Mr. Johnson's car to Buena Vista Terrace. Regarding Mr. Johnson's wallet, there had been no conclusive evidence at trial that it contained money prior to the murder, but Mr. Johnson's roommate, Mr. Collins, had testified at trial that he was sure Mr. Johnson had money on him—"maybe a couple hundred"—when he left the house because "he couldn't go all of the way up

to Boston, broke." The trial court rejected for lack of record support Mr. Stringer's theory that another individual came to the alley sometime between the time of the murder and when the police found the car a few hours later, broke the rear window, took the money from Mr. Johnson's wallet, turned off the car, and trailed the still-wet blood away from the car toward Buena Vista Terrace.

*The Telephone Records*. The trial court stated that Mr. Charles's testimony that he called Mr. Sly, not Mr. Stringer, on the -9730 number was consistent with the phone records "up to a point," in that it made sense that Mr. Charles would have been calling Mr. Sly to arrange for the drug transaction. It did not make sense, however, that Mr. Charles would have kept calling Mr. Sly after they met at the carryout restaurant if Mr. Sly had nothing to do with the murder. It was more credible that the -9730 number belonged to Mr. Stringer and that the two were discussing the murder, especially in light of the fact that Mr. Charles changed his number soon after a call with the -9730 number on June 4 and in light of Ms. Thompson's grand jury testimony. At bottom, the court had "difficulty squaring Mr. Charles's testimony with the evidence about his phone use on June 3 and June 4," and stated that, at the very least, the testimony did not assist Mr. Stringer in meeting his burden of showing actual innocence by a preponderance of the evidence or clear and convincing evidence.

*Mr. Charles's Trial Testimony and Written Affidavit.* The trial court noted that Mr. Charles's testimony was inconsistent with his testimony at Mr. Stringer's trial, in which he had claimed to be at home during the murder, and with his affidavit. Specifically, in the affidavit Mr. Charles indicated that he never reached Mr. Sly, but at the hearing he testified that they connected after several calls went to voicemail and arranged the drug transaction. And in the affidavit Mr. Charles stated that he got into a car with James Campbell after the shooting, but at the hearing he claimed that he got into his car by himself; he called Mr. Campbell, who had been at his house; and then Mr. Campbell walked to the carryout restaurant. The trial court recognized that minor inconsistencies are understandable, but it found the inconsistency regarding Mr. Campbell's whereabouts to be "not minor." That alone did not discredit Mr. Charles's testimony, but it "contribute[d] to the [c]ourt's ultimate finding that Mr. Charles is not credible."

*Other Reasons to Doubt Mr. Charles.* The court noted that Mr. Charles's relationship with Mr. Stringer, the timing of Mr. Charles's affidavit, and the fact that Mr. Charles had "nothing to lose by lying" all provided additional reasons to doubt his credibility. Mr. Charles is Mr. Stringer's nephew, and he executed the affidavit only after he and Mr. Stringer "were being held together in the D.C. jail awaiting resentencing." The court found it "likely" that Mr. Charles and Mr. Stringer "crafted the plan for the affidavit together when they met in the jail in 2014." And

Mr. Charles, the court observed, had "nothing to lose" by claiming to have acted alone and exonerating Mr. Stringer because he had already been resentenced and his convictions were final.

Ultimately, according to the trial court, "even viewed in connection with Mr. Stringer's arguments about the weaknesses of the government's case" against him at trial, Mr. Charles's testimony "fail[ed] to establish Mr. Stringer's innocence either by clear and convincing evidence or by a preponderance of the evidence."

## II.     Legal Background and Standard of Review

"In relevant part, the IPA provides that at any time, a person convicted of a criminal offense in the Superior Court may move the court to vacate the conviction or to grant a new trial on the grounds of actual innocence based on new evidence." *Caston v. United States*, 146 A.3d 1082, 1089 (D.C. 2016) (internal quotation marks, alterations, and ellipses omitted); *see* D.C. Code § 22-4135(a), (b).  "The motion must 'set forth specific, non-conclusory facts' and must identify the specific new evidence, establish how it demonstrates the movant's actual innocence, and establish why the evidence is 'not cumulative or impeaching.'"  *Caston*, 146 A.3d at 1089 (quoting D.C. Code § 22-4135(c)(1)-(3)).  As relevant here, "new evidence" is evidence that "[w]as not personally known and could not, in the exercise of reasonable diligence, have been personally known to the movant at the time of the trial or the plea proceeding."  D.C. Code § 22-4131(7)(A).  "'Actual innocence' or

'actually innocent' means that the person did not commit the crime of which he or she was convicted." *Id*. § 22-4131(1).

"In determining whether to grant relief, the court may consider any relevant evidence, but shall consider the following: (A) The new evidence; (B) How the new evidence demonstrates actual innocence; [and] (C) Why the new evidence is or is not cumulative or impeaching. . . ." *Id*. § 22-4135(g)(1). The motion must also include an affidavit by the movant stating, under penalty of perjury, that the movant "is actually innocent of the crime that is the subject of the motion, and that the new evidence was not deliberately withheld by the movant for purposes of strategic advantage." *Id*. § 22-4135(d)(1). If, after considering those factors, "the court concludes that it is more likely than not that the movant is actually innocent of the crime, the court shall grant a new trial." *Id*. § 22-4135(g)(2). If the court "concludes by clear and convincing evidence that the movant is actually innocent of the crime, the court shall vacate the conviction and dismiss the relevant count with prejudice." *Id*. § 22-4135(g)(3). *See generally Caston*, 146 A.3d at 1089-90.

"We review the denial of a motion to vacate under the IPA for abuse of discretion, giving great deference to the trial court's role as the trier of fact on the ultimate issue of 'actual innocence' under the IPA." *Williams v. United States*, 187 A.3d 559, 562 (D.C. 2018) (internal quotation marks omitted). "Thus, we apply the clearly erroneous standard of review to the trial judge's rejection of alleged newly

discovered evidence offered to prove 'actual innocence.'" *Id*. at 562-63 (internal quotation marks and alterations omitted). "As such, the scope of our review is narrow on the question of whether that new evidence establishes appellant's 'actual innocence.'" *Id*. at 563 (internal quotation marks, alterations, and ellipses omitted). "However, whether the court applied the correct legal standard in ruling on an IPA motion is a question of law that we consider de novo." *Id*. (internal quotation marks and alterations omitted).

"It cannot be gainsaid that the ultimate responsibility to determine [a witness's] credibility and whether appellant is more likely than not actually innocent lies with the Superior Court judge, and that the Superior Court judge's factual findings anchored in credibility assessments derived from personal observations of the witnesses are beyond appellate reversal unless those factual findings are clearly erroneous." *Caston*, 146 A.3d at 1099 (internal quotation marks and alterations omitted); *accord Williams*, 187 A.3d at 564. "This accords with the usual rule in an appeal from a bench trial that [a]n appellate court will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." *Williams*, 187 A.3d at 564 (internal quotation marks omitted). "[T]he significance of inconsistencies between a witness's pre-hearing and hearing statements is a determination of law, subject to appellate scrutiny." *Caston*, 146 A.3d at 1096.

### III. Analysis

Mr. Stringer argues that, in denying his motion under the Innocence Protection Act, the trial court abused its discretion in three ways. First, according to Mr. Stringer, the trial court relied on clearly erroneous findings (a) that Mr. Charles had "nothing to lose" when he confessed to killing Mr. Johnson alone, because when Mr. Charles executed his affidavit he had not yet been resentenced, and (b) that Mr. Charles and Mr. Stringer saw each other in jail before Mr. Charles executed the affidavit, because no evidence supported that finding. Second, Mr. Stringer asserts, the trial court relied on faulty assumptions in finding inconsistencies between Mr. Charles's testimony and the trial evidence or Mr. Charles's written affidavit. Third, Mr. Stringer claims, the court abused its discretion by failing to meaningfully consider the weaknesses in the government's case against him at trial.

Although, as an appellate court, we are poorly situated to determine that Mr. Charles *was* credible, we have significant reservations about the trial court's bases for finding Mr. Charles *not* credible. We find that question particularly critical here in light of the nature and strength of the trial evidence against Mr. Stringer. Accordingly, we remand for reconsideration consistent with this opinion.

### A.

As the trial court observed, this case "hinges entirely on the credibility of Mr. Charles," and the court, after personally observing him testify, "did not find

Mr. Charles to be a credible witness." We take seriously the admonition that "the ultimate responsibility to determine [a witness's] credibility and whether appellant is more likely than not actually innocent lies with the Superior Court judge, and . . . the Superior Court judge's factual findings anchored in credibility assessments derived from personal observations of the witnesses are beyond appellate reversal unless those factual findings are clearly erroneous." *Caston*, 146 A.3d at 1099 (internal quotation marks and alterations omitted); *see Bouknight v. United States*, 867 A.2d 245, 251 (D.C. 2005) ("The determination of credibility is for the finder of fact, and is entitled to substantial deference.").

Credibility findings based on first-hand observation warrant substantial deference not only because the trial court had the opportunity to assess the witness's demeanor but also because "[t]he trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985); *see Henderson v. United States*, 276 A.3d 484, 489 (D.C. 2022) ("We also defer to trial judges because they are experienced fact finders and de novo review by an appellate court is unlikely to produce significantly more accurate factual determinations. Additionally, permitting appellate courts to share more actively in the fact-finding function would tend to undermine the legitimacy of trial courts in the eyes of litigants, multiply appeals by

encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.") (internal quotation marks and alterations omitted).

Nonetheless, not all credibility findings are equal. All credibility determinations are reviewed for clear error. But we have indicated that we are particularly unlikely to find clear error with respect to credibility determinations based on the witness's demeanor—if for no other reason than that we have no appraisal of the witness's comportment to compare against the trial court's. *See Turner v. United States*, 116 A.3d 894, 927 (D.C. 2015) ("[A] credibility determination, made after the judge had the opportunity to hear the recanting witnesses' live testimony and observe their demeanor, may be overturned only if it is wholly unsupported by the evidence.") (internal quotation marks omitted); *In re Temple*, 629 A.2d 1203, 1208-09 (D.C. 1993) ("The factfinder who hears the evidence and sees the witnesses is in a better position to make such determinations, having the benefit of those critical first-hand observations of the witness'[s] demeanor or manner of testifying which are so important to assessing credibility."); *see also Anderson*, 470 U.S. at 575 ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

By contrast, "[d]ocuments or objective evidence may contradict the witness'[s] story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it"; in such circumstances, we "may well find clear error even in a finding purportedly based on a credibility determination." *Anderson*, 470 U.S. at 575. Thus, where the trial court found a witness not credible on the ground that her story was inconsistent with objective facts, we would not subject that finding to something less stringent than clear-error review, but we might be more likely to find clear error based on our own comparison between the witness's version of events and the objective facts and our assessment of the significance of any inconsistencies. *See Caston*, 146 A.3d at 1096 ("[T]he significance of inconsistencies between a witness's pre-hearing and hearing statements is a determination of law, subject to appellate scrutiny.").

In *Caston*, we observed that certain inconsistencies on which the trial court relied in assessing an IPA hearing witness's credibility appeared insignificant, but we declined to decide the significance *vel non* of the inconsistencies and remanded to the trial court. *See id*. at 1095-99, 1100. In so doing, we found it "[n]otabl[e]" that the trial court did not cite the witness's demeanor as a reason for discrediting his testimony and we therefore were not confronted "with a credibility determination that was based on factors that could only be ascertained after observing the witness testify." *Id*. at 1099 (internal quotation marks and alterations omitted). We see

*Caston* not as requiring an explicit reference to demeanor where a trial court determines credibility on that basis, but rather as recognizing the fact that credibility determinations based on objective inconsistencies are more likely to be found clearly erroneous than those that rest on the trial court's unique opportunity to assess the witness's mien and manner of testifying.

This is a case where, *if* Mr. Charles is believed, Mr. Stringer is innocent. Accordingly, *why* the trial court did not believe Mr. Charles is critical to our review. The trial court did not refer to Mr. Charles's demeanor or describe aspects of his behavior on the stand that called into question his trustworthiness. Rather, it compared Mr. Charles's testimony to the physical evidence, the telephone records, and Mr. Charles's testimony at Mr. Stringer's trial and his written affidavit. It also pointed to objective reasons to question Mr. Charles's motivations. Although we review the trial court's findings for clear error, we do not find ourselves constrained on review by an inability to assess "factors that could only be ascertained after observing the witness testify." *Id*. at 1099 (internal quotation marks and alterations omitted).

## B.

Several of the trial court's bases for finding Mr. Charles not credible give us pause. As in *Caston*, we cannot be confident that, had the court's decision not been

influenced by the following factors, it would have reached the same conclusion about the likelihood that Mr. Stringer is "actually innocent of the crime." *Id*. at 1084.

### 1. Windows, Door Locks, and Blood Trail

Mr. Charles's account of the crime scene as he left it was inconsistent with the account provided by the responding police officers, and we recognize that this raises legitimate questions. The significance of these inconsistences vis-à-vis Mr. Stringer's involvement, however, is unclear. If Mr. Charles's account of the scene was wrong, it seems to us that either suggests that he was not present for the murder—which is not a theory anyone is advancing (and would also undermine, if not destroy, the case against Mr. Stringer)—or indicates that his memory of a 15-year-old event was faulty. *See id*. at 1096-98 & 1097 n.38. If Mr. Charles committed or was present for the murder, a position the government maintains, we do not see how his mistakes regarding details bear on whether Mr. Stringer was with him or not.

### 2. Mr. Johnson's Wallet

The trial court suggested that Mr. Charles's testimony that he "did not touch Mr. Johnson's wallet" was inconsistent with the fact that police officers found Mr. Johnson's wallet empty when they arrived on the scene. An inconsistency exists, however, only if there was evidence that Mr. Johnson's wallet contained money before he was murdered. We do not see such evidence in the record.

Mr. Collins testified that he "kn[e]w [Mr. Johnson] had money on him" when Mr. Johnson left their apartment for Boston. On cross-examination, Mr. Collins explained that he was "sure" Mr. Johnson had money because "he couldn't go all of the way up to Boston, broke." Mr. Collins then twice stated that he did not know how much money Mr. Johnson had and guessed that it was "maybe a couple hundred." Mr. Collins's testimony strikes us as speculative and inconclusive and, even to the extent it supports an inference that Mr. Johnson would not have left for Boston without any money, it does not establish that that money was in Mr. Johnson's wallet, nor would an inference that Mr. Johnson would have taken money with him be inconsistent with Mr. Charles's testimony that Mr. Johnson had $13,000 with him. It is, moreover, plausible that Mr. Charles, having just stolen $13,000, would not have thought to or had any reason to touch Mr. Johnson's wallet. Accordingly, in our view, Mr. Charles's testimony that he did not touch Mr. Johnson's wallet is not an inconsistency of much significance.

### 3. The Phone Records

The trial court observed that Mr. Charles's testimony that the -9730 phone number belonged to Mr. Sly, not Mr. Stringer, was "critical to Mr. Charles's version of the events of that night." The court stated that Mr. Charles's claim was consistent with the phone records "up to a point," as Mr. Charles's account was that he was calling Mr. Sly to procure the marijuana to sell to Mr. Johnson. The court, however,

concluded that there would not have "been any reason for [Mr. Charles and Mr. Sly] to continue talking" on June 3 and June 4, after the murder (which Mr. Sly did not then know about) and the drug transaction at the carryout restaurant. Therefore, the numerous calls between Mr. Charles and the -9730 number on those days, combined with Ms. Thompson's grand jury testimony and the fact that Mr. Charles changed his phone number after his last call with the -9730 number, made it "more plausible" that Mr. Charles was talking to Mr. Stringer—"his partner in committing the murder"—than to Mr. Sly.

We are less convinced that Mr. Charles's version of events is significantly inconsistent with the telephone records. Even if Mr. Sly did not know about the murder, it strikes us as plausible that Mr. Charles would speak to Mr. Sly—a friend he had known for a while whom he called "Uncle Carlos"—nine times in two days after the two had engaged in a substantial drug transaction and Mr. Charles had 20 pounds of marijuana to sell. Indeed, Mr. Charles testified that he was "always calling" Mr. Sly, and his hearing testimony was consistent with his testimony at Mr. Stringer's trial that he talked to Mr. Sly on the night of the murder.

We agree with Mr. Stringer that Mr. Charles did not explain at the hearing why he spoke to Mr. Sly after the murder and marijuana transaction because no one asked him that question. *See Caston*, 146 A.3d at 1096 (testimony should not be discounted "solely on the basis of inconsistencies . . . that are (or might have been,

upon follow-up inquiry) explainable"); *id*. at 1098 (where "no one asked" the witness a question at the hearing, an inconsistency "did not provide an adequate basis for concluding that [the] exculpatory testimony was not credible"). To be sure, it is reasonable to assume that, had there been a "partner in committing the murder," Mr. Charles would have spoken to him in the days after the murder; but to assume that there *was* a partner and it was Mr. Stringer because Mr. Charles spoke to someone numerous times after the murder strikes us as circular.

### 4.   Whether or Not Mr. Charles Reached Mr. Sly

The trial court noted that, in his affidavit, Mr. Charles stated that Mr. Sly was supposed to join him and James Campbell when they met up with Mr. Johnson but Mr. Sly's "phone kept going to answering service"; but, at the hearing, Mr. Charles testified that three or four of his calls to Mr. Sly went to voicemail but then Mr. Sly "finally picked up." When asked about the inconsistency, Mr. Charles explained that what he meant in the affidavit was that "when I called the first couple of times it went to answering machine," but he acknowledged on cross-examination that what he wrote in his affidavit was incorrect.

We see a minor inconsistency. Mr. Charles's affidavit was a one-paragraph handwritten statement that provided an abridged version of the events of that night; one reading of the language used is that Mr. Charles failed to connect with Mr. Sly,

but Mr. Charles did not actually say as much, and we do not discern a direct contradiction between the account in the affidavit and the account at the hearing.

### 5. Mr. Campbell's Whereabouts

In his affidavit, Mr. Charles wrote that after he shot Mr. Johnson, he ran out of the alley and "jump[ed] in the car with James [Campbell] and we end[ ] up at my house." At the hearing, Mr. Charles testified that after the shooting he returned to his car, which he had parked on 28th Street, and that Mr. Campbell was still in his house. Mr. Charles tried calling Mr. Campbell several times and then Mr. Campbell eventually walked to the carryout restaurant and met up with Mr. Charles and Mr. Sly. Once Mr. Charles had bought the marijuana with Mr. Johnson's $13,000, Mr. Charles and Mr. Campbell went to Mr. Charles's mother's house and "broke the weed down" for resale. At the hearing, Mr. Charles explained that when he referred in his affidavit to getting in the car with Mr. Campbell and going to his mother's house, he meant after the meeting at the carryout restaurant. On cross-examination, he asserted that his two accounts were "the same thing basically."

The trial court found this to be a "not minor" inconsistency. The court observed:

> The affidavit and Mr. Charles's testimony present two quite different versions of the events of that night: in one version, he was with James Campbell the entire time, including when he arrived at the scene and when he left it; and in the other version, he was alone, with no involvement of Mr. Campbell at all. The Court has

difficulty believing that Mr. Charles has a specific memory of the events surrounding the killing—including how it was arranged, how he did it, and what he did immediately afterward—but cannot remember who was with him when it happened. Mr. Charles also could not explain the discrepancy in any satisfactory way.

In our view, the trial court's characterization overstates the extent of the discrepancy between Mr. Charles's accounts. We do not read Mr. Charles's affidavit to suggest that he was with Mr. Campbell the entire time; it appears to be silent on Mr. Campbell's whereabouts during the shooting itself. Nor do we see Mr. Charles's hearing testimony as suggesting that there was "no involvement of Mr. Campbell at all"; Mr. Charles testified that Mr. Campbell was with him and Mr. Johnson until they arrived at Mr. Campbell's house, at which point Mr. Campbell went inside. Mr. Charles's account appears to be consistent that he committed the shooting himself and he drove with Mr. Campbell sometime after the shooting.

To be sure, Mr. Charles's accounts of when he and Mr. Campbell were in his car together are in tension. Again, however, unless the theory is that Mr. Charles did not commit the offense at all, the tension is more sensibly attributed to sloppiness or memory lapses than to lack of credibility as to Mr. Stringer's involvement.

### 6. The Timing of Mr. Charles's Affidavit

The trial court also pointed to the timing of Mr. Charles's affidavit, accepting that Mr. Charles signed it in June 2014 and finding it notable that this was when

Mr. Charles and Mr. Stringer were "being held together in the D.C. Jail awaiting resentencing." The court stated that "Mr. Charles testified that this was the first time he and Mr. Stringer had seen each other since their respective convictions in 2006" and observed that it was "likely" that "Mr. Charles and Mr. Stringer crafted the plan for the affidavit together when they met in the jail in 2014."

The record, however, does not reflect Mr. Charles testifying that he saw or met Mr. Stringer in jail in 2014. *See Caston*, 146 A.3d at 1095 ("[A]t least one purported inconsistency reflects the [trial] court's own loose paraphrasing of [the recanting witness's] testimony."). There was, moreover, no evidence that Mr. Charles and Mr. Stringer were in the same unit or area of the jail, a point that the government used at trial to rebut Mr. Stringer's claim that he received a copy of the Mr. Charles separation order from his brother. While it is certainly *possible* that Mr. Charles and Mr. Stringer saw each other in the D.C. jail in 2014, to question Mr. Charles's credibility on that basis requires, in our view, some affirmative basis to find or infer that they did. Such an affirmative basis could have been obtained simply by posing the question to Mr. Charles, which no one did, or by the government presenting evidence of where the two were housed in the jail, which would have been uniquely in the government's possession.

### 7.     Mr. Charles Having "Nothing to Lose"

The trial court concluded that Mr. Charles had "nothing to lose by lying in this case" because, at the time of the hearing, his conviction was final and he had been resentenced. That, the court said, did not mean Mr. Charles was lying, but it "also [did] not offer any reason to conclude he [was] telling the truth."

It is true that, at the time of the hearing, Mr. Charles faced no further risk by confessing to having committed the crime alone. But the trial court appears to have accepted or assumed that Mr. Charles wrote his affidavit in June 2014, which was before his October 2014 resentencing following this court's remand on merger grounds. It is unclear to us what exposure Mr. Charles had—or believed he had—when he wrote the affidavit in June 2014. The record does not speak to the likelihood that the sentencing court in Mr. Charles's case could have received the affidavit before Mr. Stringer filed his IPA motion in December 2014. It also does not appear that the trial court considered whether the sentencing court could have increased Mr. Charles's sentence when resentencing him on remand. *See Smith v. United States*, 687 A.2d 581, 583 (D.C. 1996) (noting the "general rule—premised on double jeopardy concerns—that, once a defendant begins serving a sentence, the sentence may not lawfully be increased"); *Bean v. United States*, 606 A.2d 770, 772 (D.C. 1992) (per curiam) (increased sentence on remand after a successful appeal is

allowable only if there is a good reason for the increase and the explanation for the increase affirmatively appears on the record).

We take no position on the latter question, and we recognize that if Mr. Charles's sentence could not have been increased, that supports the trial court's view that he had nothing to lose. We simply observe that whether Mr. Charles faced a risk at the time of the *hearing* does not entirely resolve the "nothing to lose" question if, as the trial court appeared to accept, Mr. Charles signed the affidavit in June 2014.[2]

### C.

On remand, it will be "incumbent on the court" to "consider the potential weaknesses in the government's case," *Caston*, 146 A.3d at 1099, to a greater extent than it did. In this regard, we note that, as in *Caston*, the trial judge did not preside over Mr. Stringer's (or Mr. Charles's) trial and thus was not in an advantageous position to assess the weight of the trial evidence. *See id*. at 1099 (IPA motion judge

---

[2] Putting aside the procedural aspects of the question whether Mr. Charles faced greater sentencing exposure in June 2014, it seems to us that Mr. Charles had—or would have thought he had—quite a bit to lose by confessing to be the sole killer. His initial sentence was five years shorter than Mr. Stringer's. The government acknowledged during Mr. Charles's sentencing that Mr. Stringer had been "the leader of this" and argued during Mr. Stringer's sentencing that Mr. Stringer was "the leader" and "the one that pulled the trigger." The trial court observed during Mr. Stringer's sentencing that Mr. Charles had been only "technically" an adult at the time and "look[ed] up" to his uncle Mr. Stringer, who was 18 years older than him. Those arguments in favor of relative leniency disappeared once Mr. Charles asserted that he had acted alone.

"did not preside over appellant's trial, and we thus are constrained to observe that his assessment of the weight of the trial evidence can be no better than our own"). *Cf. Gaither v. United States*, 759 A.2d 655, 664 & n.15 (D.C. 2000) (usual principle in *Brady v. Maryland* matters that trial judge is best positioned to determine whether the failure to disclose was prejudicial to the defendant because the judge was "on the scene" was not applicable because, "although the motions judge was able to assess the witness'[s] demeanor at the hearing on the motion for a new trial, he did not preside over the trial").

We have said in the IPA context that if the trial court determines that a "recantation is not credible, that determination ends the inquiry." *Bell v. United States*, 871 A.2d 1199, 1201 (D.C. 2005) (internal quotation marks omitted). A credibility determination cannot, however, occur in a vacuum. We think that an assessment of Mr. Charles's credibility based on any inconsistencies between his affidavit and hearing testimony, on the one hand, and the trial evidence, on the other, requires some consideration of the strength of the trial evidence against Mr. Stringer. We also note that Mr. Charles is not exactly a recanting witness, as he did not inculpate Mr. Stringer at trial and then seek to retract that inculpatory testimony later. To be sure, his affidavit and hearing testimony were inconsistent with his trial testimony that he was at home during Mr. Johnson's murder, and, ultimately, the trial court had to determine which version of Mr. Charles's story to believe. *Cf.*

*Payne v. United States*, 516 A.2d 484, 493 (D.C. 1986) (per curiam) ("where a witness recants, the trier of fact must decide whether to accept as true the witness'[s] original testimony or revised testimony"). But it is notable that Mr. Charles has never asserted that Mr. Stringer was involved in the murder.

We recognize that, on direct appeal, we concluded that the evidence against Mr. Stringer was sufficient to support his convictions, and, indeed, characterized the evidence as "considerable." *Barry Stringer v. United States*, No. 06-CF-1515, Mem. Op. & J. (D.C. July 20, 2009). We do not seek to revisit that conclusion, but observe only that, in the context of an actual innocence claim as opposed to a sufficiency claim, the trial evidence warrants some closer examination.

For example, as we have already noted, Mr. Charles's credibility with respect to Mr. Johnson's wallet cannot be evaluated without recognizing that Mr. Collins's testimony about Mr. Johnson taking money to Boston was speculative. Similarly, although she was impeached with her grand jury testimony, Ms. Thompson provided at trial an explanation about the user of the -9730 number that was consistent with Mr. Charles's explanation, which the trial court found "critical to Mr. Charles's version of the events of that night." As in *Caston*, "[t]he court had no basis for assessing the credibility of [Ms. Thompson's] trial testimony." 146 A.3d at 1099 n.43.

The trial testimony of Mr. Lyles also raises significant questions. When he testified, Mr. Lyles "had not yet been sentenced, and hoped for a favorable recommendation from the government in exchange for his inculpatory testimony against" Mr. Stringer. *Id*. at 1099. Mr. Lyles told law enforcement four times that Mr. Stringer had not told him anything about the shooting before he reversed course, claiming that Mr. Stringer volunteered with no prompting that he was the shooter. Mr. Lyles testified that Mr. Charles told him that Mr. Charles and the murder victim were in a car together in an alley when Mr. Stringer came up, got in the car, and shot the victim. The most reasonable view of this evidence is that Mr. Charles and Mr. Johnson were in the front seats of the car and Mr. Stringer, as the third person in the vehicle, got into a back seat. Although a ballistics expert did not testify at trial, it seems at least worth questioning whether, if Mr. Stringer had in fact shot Mr. Johnson from a back seat toward the front driver's seat, the bullet would have exited through the rear driver's side window, as it did.

## IV. Conclusion

For all of the foregoing reasons, we conclude that a remand is necessary for the trial court to reconsider, in light of the issues we have addressed above, the significance *vel non* of the inconsistencies it identified in finding Mr. Charles not credible and to consider those inconsistencies in light of asserted weaknesses in the government's case at trial and the evidence as a whole. Accordingly, the trial court's

order is hereby vacated and the matter remanded for further proceedings consistent with this opinion.

*So ordered.*